NADEJDA BARANNIKOVA *v.* TOWN OF
GREENWICH ET AL.
(14857)
(14858)

PETERS, C. J., BORDEN, NORCOTT, KATZ and PALMER, Js.

Argued March 24—decision released June 14, 1994

*Phyllis E. Hyman,* assistant attorney general, with whom were *Hugh Barber,* assistant attorney general, *John K. Wetmore* and, on the brief, *Richard Blumenthal,* attorney general, and *Richard J. Lynch,* assistant attorney general, for the appellants (defendants).

*James D. Henderson,* with whom were *Shirley Bergert* and *David B. Blaber,* for the appellee (plaintiff).

KATZ, J. In this appeal, the commissioner of the department of income maintenance (commissioner),[1] Audrey Rowe, appeals from the trial court's judgment setting aside the commissioner's denial of general

---

[1] The town of Greenwich and the commissioner of the department of income maintenance have filed separate appeals in this case. The town, acting through its legal counsel, has authorized the commissioner to represent its interests in this appeal. As a result, only one set of briefs was filed by the appellants. We also note that the department of income maintenance has been renamed the department of social services effective July 1, 1993. Public Acts 1993, No. 93-262, § 1.

assistance benefits to the plaintiff, Nadejda Barannikova, on the ground that the statute[2] and the implementing regulation[3] on which the denial was based violated the plaintiff's right to the equal protection of the laws as guaranteed by the fourteenth amendment to the United States constitution. The commissioner argues that the trial court improperly determined that the state statute and the regulation constituted an invidious distinction based on alienage and improperly subjected them to strict scrutiny. The commissioner contends that because the state law parallels a federal law it did not constitute an invidious state classification and, like its federal counterpart, should have been rationally reviewed. Alternatively, the commissioner asserts that the state law and the regulation do not classify on the basis of alienage. Conversely, the plaintiff claims that the statute and the regulation are purely

[2] General Statutes § 17-273 (d) provides: "On and after September 4, 1991, if an individual sponsors a person admitted as a resident of the United States, such individual's income shall be deemed to be available for the support of the person for three years from the date the person enters the United States."

[3] Section 17-3a-14 (D) (8) of the Regulations of Connecticut State Agencies provides in relevant part:

"8. Sponsors of Non-Citizens

"A sponsor is an individual (or organization) who, through execution of an affidavit, agrees to support the non-citizen for a period of three years from his/her date of entry into the United States. This affidavit, or similar agreement, is a condition of the non-citizen's entry into the United States. (Refer to subsection E for special conditions concerning refugee sponsors.)

. . .

"a. Deeming the Sponsor's Income

"Within four working days, the local welfare official must obtain verification from the sponsor of the amount of all his/her income, including that of his/her spouse if they live together. The town may accept pay stubs or other employer verifications or may use the W-1613, 'General Assistance Certificate For Disclosure of Gross Wages, Salary or Commission Paid' in order to secure the necessary financial information. (Refer to Section VI for acceptable verification of earnings or self-employment.) The failure or refusal to document the income of the sponsor and/or his/her spouse will result in the denial or discontinuance of the non-citizen's General Assistance, as appropriate."

state welfare eligibility requirements that affect only aliens and, as such, are inherently suspect. The plaintiff further contends that the state action in this case should not be treated as though it was a federal action because it is neither required nor authorized by federal law. We agree with the plaintiff and therefore affirm the judgment of the trial court.

The following facts are undisputed. The plaintiff, her husband, Vladimir Barannikova, and their three children emigrated from the former Soviet Union to this country in October, 1989. At that time, they were lawfully admitted as resident aliens through the sponsorship of Lida Klever, the plaintiff's sister-in-law. As a condition of the Barannikovas' admission to the United States, Klever signed an affidavit of support by which she pledged to support the family for a period of three years following their entry.

In February, 1990, the plaintiff separated from her husband and, later that summer, filed for divorce in California. In September of the same year, the plaintiff and her two minor children moved from California to Greenwich, where they took up permanent residence. The plaintiff's divorce from her husband was finalized in January, 1991. Since the finalization of the divorce, neither the plaintiff nor her children have received any support from Klever, who resides in Los Angeles, California, or from Vladimir. On March 24, 1992, the plaintiff filed an application for general assistance benefits on behalf of herself and her two minor children with the town of Greenwich (town). The application was granted subject to receipt by the town of financial information from Klever.

On April 9, 1992, pursuant to General Statutes § 17-273 (d) and General Assistance Policy Transmittal, G.A. 91-6, § 5,[4] the town sought financial infor-

[4] The substance of General Assistance Policy Transmittal, G.A. 91-6, § 5, has been codified at § 17-3a-14 (D) (8) of the Regulations of Connecticut

mation from Klever in order to determine whether the plaintiff would be eligible for general assistance benefits. Because Klever refused to cooperate, the plaintiff's application for general assistance was denied. Thereafter, the plaintiff requested and was granted two fair hearings to protest the denial of her application. Pursuant to General Statutes §§ 17-292d[5] and 17-292e,[6]

State Agencies. We, therefore, treat the plaintiff's appeal as claiming that the regulation is unconstitutional, and refer to the regulations rather than the policy transmittal in the remainder of this opinion.

[5] General Statutes § 17-292d provides: "FAIR HEARINGS. APPLICATION. (a) Any person whose application for assistance under sections 17-273 and 17-292 is rejected or whose receipt of such assistance is terminated or modified, except as provided in subsection (c) of this section, shall have the right to a fair hearing to review such decision in accordance with sections 17-292e and 17-292f, provided that the town has held a hearing in accordance with this section. Any such person shall be notified in writing immediately of a rejection, termination or modification of such assistance and of the right to such hearings.

"(b) Within ten working days of an action to reject, terminate or modify his assistance, except as provided in subsection (c) of this section, a person may make a signed application requesting a hearing held by the public welfare official. Within three working days after receipt of such application for a hearing concerning a decision on an application for assistance and within seven working days after receipt of such application for a hearing concerning a decision on matters other than an application for assistance, the public welfare official shall hold such hearing. Within three days after the hearing, the public welfare official shall render a decision based solely upon all the evidence introduced at the hearing and the application of all pertinent provisions of law, regulation and state policy. Notice of the decision shall be mailed to the aggrieved person within three days of its rendition.

"(c) No person shall have the right to a hearing before a public welfare official or a fair hearing by the commissioner due to the levels of assistance to be granted under the general assistance program established pursuant to section 17-3a."

[6] General Statutes § 17-292e provides in relevant part: "PROCEDURE FOR FAIR HEARINGS BY COMMISSIONER. (a) An aggrieved person, or the conservator of such person on his behalf, authorized by law to request a fair hearing to review a decision of a public welfare official may make a signed application for such hearing to the commissioner and shall state in such application why he claims to be aggrieved. Such application shall be mailed to the commissioner within ten days of such decision. Within fifteen days after receipt of an application to review a decision of a public welfare offi-

the plaintiff first had a hearing before the town and then before the state department of income maintenance (department). The hearing officers at each hearing upheld the town's denial of the plaintiff's application on the ground that she had failed to submit information necessary to determine eligibility. The missing information was Klever's income data, which Klever had refused to provide as a result of hostility that had developed between herself and the plaintiff.[7]

The plaintiff appealed from the decisions of the hearing officers to the Superior Court pursuant to General Statutes §§ 17-2b[8] and 4-183.[9] The plaintiff challenged the decisions on the grounds that General Statutes

cial, or within four business days if the application concerns a decision on an application for assistance, the commissioner shall hold a fair hearing at a location convenient to the person requesting the hearing."

[7] In response to the town's request for financial information, Klever telephoned the town department of social services and stated that she did not want anything to do with the plaintiff and refused to furnish any financial data.

[8] General Statutes § 17-2b provides in relevant part: "DECISION. APPEAL. EXTENSION OF TIME LIMIT FOR FILING APPEAL. (a) Not later than sixty days after such hearing, or three business days if the hearing concerns a denial of or failure to provide emergency housing, the commissioner or his designated hearing officer shall render a final decision based upon all the evidence introduced before him and applying all pertinent provisions of law, regulations and departmental policy, and such final decision shall supersede the decision made without a hearing, provided final definitive administrative action shall be taken by the commissioner or his designee within ninety days after the request of such hearing pursuant to section 17-2a. Notice of such final decision shall be given to the aggrieved person by mailing him a copy thereof within one business day of its rendition. Such decision after hearing shall be final except as provided in subsections (b) and (c) of this section.

"(b) The applicant for such hearing, if aggrieved, may appeal therefrom in accordance with section 4-183. Appeals from decisions of said commissioner shall be privileged cases to be heard by the court as soon after the return day as shall be practicable."

[9] General Statutes § 4-183 provides in relevant part: "APPEAL TO SUPERIOR COURT. (a) A person who has exhausted all administrative remedies available within the agency and who is aggrieved by a final decision may appeal to the superior court as provided in this section. The filing of a peti-

§ 17-273 (d) and § 17-3a-14 (D) (8) of the Regulations of Connecticut State Agencies are unconstitutional under the equal protection and due process clauses of the fourteenth amendment to the United States constitution.[10] She requested that the trial court reverse the administrative decisions of the state and town hearing officers, and remand her application to the town for a determination of eligibility and provision of benefits, including retroactive benefits.

The trial court concluded that the statute and the regulation at issue determined eligibility for general assistance benefits using classifications based on alienage. The court rejected the commissioner's claim, reviewed on this appeal, that the general assistance

tion for reconsideration is not a prerequisite to the filing of such an appeal. . . .

"(i) The appeal shall be conducted by the court without a jury and shall be confined to the record. If alleged irregularities in procedure before the agency are not shown in the record or if facts necessary to establish aggrievement are not shown in the record, proof limited thereto may be taken in the court. The court, upon request, shall hear oral argument and receive written briefs.

"(j) The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court shall affirm the decision of the agency unless the court finds that substantial rights of the person appealing have been prejudiced because the administrative findings, inferences, conclusions, or decisions are: (1) In violation of constitutional or statutory provisions; (2) in excess of the statutory authority of the agency; (3) made upon unlawful procedure; (4) affected by other error of law; (5) clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or (6) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion. If the court finds such prejudice, it shall sustain the appeal and, if appropriate, may render a judgment under subsection (k) of this section or remand the case for further proceedings. For purposes of this section, a remand is a final judgment."

[10] The fourteenth amendment to the United States constitution provides in relevant part: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty or property, without due process of law; *nor deny to any person within its jurisdiction the equal protection of the laws.*" (Emphasis added.)

sponsor income deeming scheme should be subjected to rational basis review because it parallels the federal sponsor income deeming scheme enacted under a federally sponsored welfare program, namely Aid to Families with Dependent Children (AFDC). See 42 U.S.C. § 601 et seq. (1991).[11] Noting that federal law regarding aliens is deferentially reviewed "due to the broad constitutional power of Congress to regulate immigration; see, e.g., *Mathews* v. *Diaz,* 426 U.S. 67, 85–87, [96 S. Ct. 1883, 48 L. Ed. 2d 478] (1976)"; see also footnote 24; the trial court determined that the state statutory and regulatory provisions are subject to strict scrutiny because they discriminate on the basis of alienage. Applying strict scrutiny, the trial court concluded that the governing statute and the regulation violate the equal protection clause of the fourteenth amendment to the United States constitution. Accordingly, the court rendered judgment for the plaintiff and remanded the case for a determination of eligibility.

The commissioner appeals directly to this court from the judgment of the trial court pursuant to General Statutes § 51-199 (b),[12] claiming that: (1) the trial court improperly subjected General Statutes § 17-273 (d) and § 17-3a-14 (D) (8) of the Regulations of Connecticut State Agencies to strict scrutiny; and (2) the statute

[11] The AFDC sponsor income deeming scheme is located at 42 U.S.C. § 615 (a) (1991), which provides in relevant part: "For purposes of determining eligibility for and the amount of benefits under a State plan approved under this part for an individual who is an alien . . . the income and resources of any person who (as a sponsor of such individual's entry into the United States) executed an affidavit of support or similar agreement with respect to such individual, and the income and resources of the sponsor's spouse, shall be deemed to be the unearned income and resources of such individual . . . for a period of three years after the individual's entry into the United States . . . ."

[12] General Statutes § 51-199 (b) provides in relevant part: "The following matters shall be taken directly to the supreme court . . . (2) an appeal in any matter where the superior court declares invalid a state statute or a provision of the state constitution . . . ."

and the regulation are rationally related to a legitimate governmental interest.[13] We affirm the judgment of the trial court.

## I

General assistance is a state run program designed to aid individuals and their families who have insufficient income or assets to meet their essential needs.[14] See General Statutes §§ 17-272 through 17-292f. It is locally funded and managed by the 169 cities and towns of the state. General Statutes § 17-273 (a).[15] The department oversees the administration of the program and reimburses 85 percent of the towns' program costs without any federal matching funds or assistance whatsoever.[16] Regs., Conn. State Agencies § 17-3a-11 (D). The commissioner is authorized by General Statutes § 17-3a to adopt regulations establishing standards for the granting of general assistance benefits and the level of financial assistance to be provided. Currently, the level of benefits is set at $314 per month for a single employable person and $356 per month for a single unemployable person. General Statutes § 17-3a (a).

---

[13] The commissioner does not argue that she can prevail should this court agree with the trial court's decision to apply the strict scrutiny test. The commissioner's argument rests entirely on her claim that the rational review test is the appropriate standard.

[14] Essential needs include food, shelter, clothing, utilities and medical treatment. Regs., Conn. State Agencies § 17-3a-11 (B).

[15] General Statutes § 17-273 (a) provides in relevant part: "Each person who has not estate sufficient for his support, and has no relatives of sufficient ability who are obliged by law to support him, shall be provided for and supported to the extent required under the provisions of this chapter and section 17-3a at the expense of the town in which he resides, except as otherwise provided in this section, or, if he has no residence, of the town in which he becomes in need of aid . . . ."

[16] This system is in keeping with Connecticut's history of caring for its poor, without regard to alienage, at the local level. Indeed, the state has provided for its poor through its towns since the early 1600s. Note, "Illegal Aliens, The Social Compact and The Connecticut Constitution," 13 U. Bridgeport L. Rev. 331, 360–61 (1993).

An applicant must be needy in order to qualify for general assistance benefits. For purposes of general assistance eligibility, a person is in need if his or her available income and assets are insufficient to meet his or her essential needs. See footnote 14. When determining what income and assets are available to the applicant, the income and assets of every member of the unit applying for aid are applied against budgeted needs, including the income and assets of minor children. In addition, certain other income and assets not actually in the possession of the members of the applicant unit are deemed available to the applicant. Regs., Conn. State Agencies § 17-3a-14 (B) (4). General Statutes § 17-273 (d) provides that when an applicant for general assistance who is admitted to the United States under color of law has an individual sponsor, the income of the sponsor is deemed to be available to the applicant for purposes of determining eligibility for a period of three years from the date the applicant enters the country. See footnote 2. Section 17-3a-14 (D) (8) of the Regulations of Connecticut State Agencies implements the statutory deeming policy. See footnote 3. The regulation provides that if the sponsor fails or refuses to provide information to the town on the sponsor's income, the application for general assistance will be denied for failure to provide information necessary to determine eligibility. Although the federal government requires such a pledge for admission to the country in certain instances,[17] the parties in this case agree that the affidavit does not constitute a legally enforceable

[17] Immigration law bars admission of any alien who, at the time of application for entry, is likely to become a public charge. 8 U.S.C. § 1182 (a) (4) (Sup. 1994). For example, an alien who enters without adequate funds to remain self-sufficient or without a promise of employment is considered likely to become a public charge. Foreign Affairs Manual § 40.41, N2, reprinted in 10 C. Gordon & S. Mailman, Immigration Law and Procedure (1993). An alien who otherwise might be likely to become a public charge may, nonetheless, gain entry by including affidavits of support from friends or relatives with the alien's visa application. Id., N6. Thus, affida-

promise of support.[18] The general assistance deeming scheme, thus, treats a portion of the sponsor's income as available to the applicant regardless of whether the income is actually received by or available to the applicant.

Against this legal background, the commissioner's principal claim is that the trial court improperly subjected General Statutes § 17-273 (d) and § 17-3a-14 (D) (8) of the Regulations of Connecticut State Agencies to strict scrutiny under the equal protection clause of the fourteenth amendment to the United States constitution. The commissioner argues that the statute passes constitutional muster under rational basis review. The commissioner contends that the state statute and the regulation, which parallel a federal statute, should be subjected to rational review because federal laws concerning immigration and naturalization are subjected only to rational review. The commissioner also contends that the sponsor income deeming scheme should be subject to rational basis review because it does not create a classification based on alienage, but one based on sponsorship. We disagree with both contentions.

The equal protection clause of the fourteenth amendment limits the power of the state to enact discrimina-

vits of support are required in the sense that one who is deemed likely to become a public charge must show an alternate source of support to gain entry.

[18] Although the United States Supreme Court has not addressed the issue, several state courts have suggested that the affidavit of support creates a moral rather than a legal obligation. See *San Diego* v. *Viloria,* 276 Cal. App. 2d 350, 80 Cal. Rptr. 869 (1969); *El Souri* v. *Dept. of Social Services,* 429 Mich. 203, 414 N.W.2d 679 (1987); *State ex rel. Attorney General* v. *Binder,* 356 Mich. 73, 96 N.W.2d 140 (1959); *Dept. of Mental Hygiene of California* v. *Renel,* 10 Misc. 2d 402, 173 N.Y.S.2d 231 (1958); J. Guendelsberger, "Equal Protection and Resident Alien Access to Public Benefits in France and the United States," 67 Tul. L. Rev. 669, 673 n.11 (1993). In addition, Congress has previously rejected proposed legislation that would have made the affidavits legally binding obligations. *Minino* v. *Perales,* 79 N.Y.2d 883, 885, 589 N.E.2d 385, 581 N.Y.S.2d 162 (1992).

tory statutes. It provides that, "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const., amend. XIV, § 1. "It has long been settled, and it is not disputed here, that the term 'person' in this context encompasses lawfully admitted resident aliens as well as citizens of the United States and entitles both citizens and aliens to the equal protection of the laws of the State in which they reside. *Yick Wo* v. *Hopkins,* [118 U.S. 356, 369, 6 S. Ct. 1064, 30 L. Ed. 220 (1886)]; *Truax* v. *Raich,* [239 U.S. 33, 39, 36 S. Ct. 7, 60 L. Ed. 131 (1915)]; *Takahashi* v. *Fish & Game Commission,* [334 U.S. 410, 420, 68 S. Ct. 1138, 92 L. Ed. 1478 (1948)]." *Graham* v. *Richardson,* 403 U.S. 365, 371, 91 S. Ct. 1848, 29 L. Ed. 2d 534 (1971).

Although the equal protection clause directs that "all persons similarly circumstanced shall be treated alike"; *F. S. Royster Guano Co.* v. *Virginia,* 253 U.S. 412, 415, 40 S. Ct. 560, 64 L. Ed. 989 (1920); it "does not require things which are different in fact or opinion to be treated in law as though they were the same." *Tigner* v. *Texas,* 310 U.S. 141, 147, 60 S. Ct. 879, 84 L. Ed. 1124 (1940). Generally, the states retain broad discretion to determine what is different and what is the same. *Plyler* v. *Doe,* 457 U.S. 202, 216, 102 S. Ct. 2382, 72 L. Ed. 2d 786 (1982). In most cases, therefore, a state legislature is free to classify as long as the distinction it draws "bears some fair relationship to a legitimate public purpose." Id.

Nonetheless, the United States Supreme Court has determined that in order to carry out the constitutional mandate of equality a less deferential standard must be applied to certain "presumptively invidious" classifications such as alienage,[19] race[20] and national ori-

---

[19] See, e.g., *Nyquist* v. *Mauclet,* 432 U.S. 1, 97 S. Ct. 2120, 53 L. Ed. 2d 63 (1977); *In re Griffiths,* 413 U.S. 717, 93 S. Ct. 2851, 37 L. Ed. 2d 910 (1973); *Graham* v. *Richardson,* supra, 403 U.S. 365.

[20] See, e.g., *Richmond* v. *J. A. Croson Co.,* 488 U.S. 469, 109 S. Ct. 706, 102 L. Ed. 2d 854 (1989); *Loving* v. *Virginia,* 388 U.S. 1, 87 S. Ct. 1817,

gin.[21] Id. The court has determined that "[t]hese factors are so seldom relevant to the achievement of any legitimate state interest that laws grounded in such considerations are deemed to reflect prejudice and antipathy—a view that those in the burdened class are not as worthy or deserving as others. For these reasons and because such discrimination is unlikely to be soon rectified by legislative means, these laws are subjected to strict scrutiny and will be sustained only if they are suitably tailored to serve a compelling state interest. *McLaughlin* v. *Florida,* [379 U.S. 184, 192, 85 S. Ct. 283, 13 L. Ed. 2d 222 (1964)]; *Graham* v. *Richardson,* [supra, 403 U.S. 365]." *Cleburne* v. *Cleburne Living Center, Inc.,* 473 U.S. 432, 440, 105 S. Ct. 3216, 87 L. Ed. 2d 267 (1985); see also *Korematsu* v. *United States,* 323 U.S. 214, 216, 65 S. Ct. 193, 89 L. Ed. 194 (1944).

A

It is against this backdrop of fourteenth amendment equal protection jurisprudence that we address the commissioner's first claim, that because federal laws regarding aliens have been deferentially reviewed, state laws that parallel federal law should be similarly reviewed. Although the standard of review of legislative classifications regarding aliens has differed in a number of cases, we reject the commissioner's argument because the governmental interests and constitutional concerns that have led the United States Supreme Court to afford deferential review to federal laws based on alienage are not at issue when, as here, a state imitates the federal government without authorization to do so. Indeed, "[t]he standard of review has varied depend-

---

18 L. Ed. 2d 1010 (1967); *Bolling* v. *Sharpe,* 347 U.S. 497, 74 S. Ct. 693, 98 L. Ed. 884 (1954).

[21] See, e.g., *Korematsu* v. *United States,* 323 U.S. 214, 65 S. Ct. 193, 89 L. Ed. 194 (1944); *Hirabayashi* v. *United States,* 320 U.S. 81, 63 S. Ct. 1375, 87 L. Ed. 1774 (1943).

ing upon the governmental interest at stake and the purpose served by such a classification." *El Souri* v. *Dept. of Social Services,* 429 Mich. 203, 208, 414 N.W.2d 679 (1987).

The court's decisions regarding alienage classifications can be divided into three categories. First, state or local laws that classify on the basis of alienage to determine eligibility to receive economic benefits are inherently suspect and are thus subject to strict judicial scrutiny under the equal protection clause of the fourteenth amendment. *Graham* v. *Richardson,* supra, 403 U.S. 372–73. The court has recognized that, regarding state welfare policy, there is little or no reason for treating resident aliens differently from persons who are citizens of the United States. Id.; see *Toll* v. *Moreno,* 458 U.S. 1, 20, 102 S. Ct. 2977, 73 L. Ed. 2d 563 (1982) (Blackmun, J., concurring); *Mathews* v. *Diaz,* supra, 426 U.S. 85. For example, there is no rational basis for utilizing such a distinction in order to protect the state fisc because resident aliens are subject to state and federal taxation in the same manner as resident citizens. See, e.g., *Nyquist* v. *Mauclet,* 432 U.S. 1, 12, 97 S. Ct. 2120, 53 L. Ed. 2d 63 (1977). The court has also recognized that resident aliens are not distinct from citizens in terms of expected duration of residence within a given state. See, e.g., *Sugarman* v. *Dougall,* 413 U.S. 634, 645, 93 S. Ct. 2842, 37 L. Ed. 2d 853 (1973) (noting similarity between resident aliens and citizens regarding payment of taxes, service in armed forces and duration of residency). State or local welfare laws, therefore, may classify on the basis of alienage only if the classifications are necessary to promote a compelling governmental interest.

Second, the court has carved out a political functions exception to the application of strict scrutiny to state and local laws. When such state or local laws based on alienage relate to the allocation of political power or

governmental positions, the laws will not offend the equal protection clause if they are rationally related to a legitimate governmental interest. See, e.g., *Bernal v. Fainter,* 467 U.S. 216, 220, 104 S. Ct. 2312, 81 L. Ed. 2d 175 (1984) (citizenship as condition of employment rationally reviewed when position is "intimately related to the process of democratic self-government"); *Cabell v. Chavez-Salido,* 454 U.S. 432, 440, 102 S. Ct. 735, 70 L. Ed. 2d 677 (1982) (classification must involve a state elected or important nonelected officer who participates " 'directly in the formulation, execution, or review of broad public policy' "); *Ambach v. Norwick,* 441 U.S. 68, 75, 99 S. Ct. 1589, 60 L. Ed. 2d 49 (1979) (law rationally reviewed when classification is related to state function involving operation of state as governmental entity). This "narrow exception" to the general rule is based on the concept that "within broad boundaries a State may establish its own form of government and limit the right to govern to those who are full-fledged members of the political community." *Bernal v. Fainter,* supra, 221. In this context, citizenship is a reasonable basis upon which to make distinctions because aliens are "persons who have not become part of the process of democratic self-determination." Id.[22] As the court has been careful to note, however, its conclusion that restrictions serving a political function should be reviewed deferentially does not undermine its earlier position that restrictions on resident aliens that primarily affect economic interests are sub-

---

[22] "It must be remembered that states may not pursue foreign policy objectives; state classifications must relate to a legitimate local interest." 3 R. Rotunda & J. Nowak, Substance and Procedure (2d Ed. 1992) § 18.12, p. 219. This is because the states may not encroach on what the United States Supreme Court has repeatedly stated is exclusively the federal government's power " '[t]o establish [a] uniform Rule of Naturalization,' U.S. Const., Art. I, § 8, cl. 4, its power '[t]o regulate Commerce with foreign Nations,' id., cl. 3, and its broad authority over foreign affairs . . . ." (Citations omitted.) *Toll v. Moreno,* supra, 458 U.S. 10; see footnote 25.

ject to heightened judicial scrutiny. Id., 221, 222 n.7; *Cabell* v. *Chavez-Salido,* supra, 439; *Ambach* v. *Norwick,* supra, 75.

Third, as the commissioner correctly argues in the present case, the United States Supreme Court has applied rational basis review to a federal welfare law, 42 U.S.C. § 1395*o* (2) (1970 Ed., Sup. IV), that conditioned a resident alien's eligibility for federal medicare benefits on admission for permanent residence in the United States and a five year period of continuous residence. *Mathews* v. *Diaz,* supra, 426 U.S. 67. The court in *Mathews* held that the due process clause of the fifth amendment to the United States constitution[23] did not prohibit such a classification by the federal government. The court stated that "[t]he reasons that preclude judicial review of political questions also dictate a narrow standard of review of decisions made by the Congress or the President in the area of immigration and naturalization." Id., 81–82. The court reasoned that because "the responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches of the Fed-

---

[23] The due process clause of the fifth amendment to the United States constitution provides: "No person shall . . . be deprived of life, liberty, or property, without due process of law . . . ."

The equal protection clause of the fourteenth amendment, by its own terms, applies to the states only and not to the actions of the federal government. See footnote 14. The due process clause of the fifth amendment, however, has been held to provide a limitation on the federal government's ability to classify that is identical in theory to that of the equal protection clause of the fourteenth amendment. See, e.g., *Buckley* v. *Valeo,* 424 U.S. 1, 93, 96 S. Ct. 612, 46 L. Ed. 2d 659 (1976); *Weinberger* v. *Wiesenfeld,* 420 U.S. 636, 638 n.2, 95 S. Ct. 1225, 43 L. Ed. 2d 514 (1975); *Bolling* v. *Sharpe,* 347 U.S. 497, 499, 74 S. Ct. 693, 98 L. Ed. 884 (1954). The equal protection guarantee of the fifth amendment is derived from the idea that some "discrimination may be so unjustifiable as to be violative of due process." *Bolling* v. *Sharpe,* supra, 499; see generally K. Karst, "The Fifth Amendment's Guarantee of Equal Protection," 55 N.C.L. Rev. 541 (1977). Thus, for the same reasons that certain classifications are so invidious or unjustifiable as to deny one the equal protection of the laws, that same denial violates one's right to due process.

eral Government," separation of powers concerns require deference to the decisions of the co-equal branches in these matters.[24] Id., 81. Additionally, the court noted that federal legislation that treats aliens differently from citizens is not presumptively invidious because, although state classifications on the basis of alienage have "no apparent justification . . . a comparable classification by the Federal Government is a routine and normally legitimate part of its business." Id., 85. Consequently, the court deferentially reviewed the federal statute, § 1395*o* (2), and found it constitutional.

In its decision in *Mathews,* however, the court distinguished *Graham* v. *Richardson,* supra, 403 U.S. 365, stating: "That case holds that *state statutes* that deny welfare benefits to resident aliens, or to aliens not meeting a requirement of durational residence within the United States, violate the *Equal Protection Clause of the Fourteenth Amendment* and encroach upon the

---

[24] Historically, Congress has enjoyed almost unfettered discretion to regulate the exclusion and deportation of immigrants. See, e.g., *Harisiades* v. *Shaughnessy,* 342 U.S. 580, 72 S. Ct. 512, 96 L. Ed. 586 (1952); *Fong Yue Ting* v. *United States,* 149 U.S. 698, 13 S. Ct. 1016, 37 L. Ed. 905 (1893); *Chae Chan Ping* v. *United States,* 130 U.S. 581, 9 S. Ct. 623, 32 L. Ed. 1068 (1889). This broad discretion is rooted in the plenary power doctrine, which posits that "any policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government." *Harisiades* v. *Shaughnessy,* supra, 588–89. The judicial review of congressional decision making in these areas is extremely narrow because such decisions "are so exclusively entrusted to the political branches of government" that even intrusion by the courts raises serious separation of powers concerns. Id., 589; see also *Fiallo* v. *Bell,* 430 U.S. 787, 97 S. Ct. 1473, 52 L. Ed. 2d 50 (1977). Thus, federal legislation regarding aliens is reviewed deferentially for unique reasons of sovereignty and national security, which are not at issue with regard to other federal legislation or, as here, state legislation concerning aliens. For a general discussion of the plenary power doctrine, see note, "Immigration Law—*Flores* v. *Meese:* A Lost Opportunity to Reconsider the Plenary Power Doctrine in Immigration Decisions," 14 W. New Eng. L. Rev. 257 (1992).

exclusive federal power over the entrance and residence of aliens." (Emphasis added.) *Mathews* v. *Diaz,* supra, 426 U.S. 84. For the purposes of the present case, the relevance of this distinction lies in the fact that the equal protection analysis used in *Graham,* "involves significantly different considerations because it concerns the relationship between aliens and the States rather than between aliens and the Federal Government." Id., 84–85; see footnote 24. After *Mathews,* therefore, the rule under the fourteenth amendment continues to be that state law classifications regarding eligibility for welfare benefits based on alienage are unconstitutional unless they are narrowly tailored to achieve a compelling government interest.

In the present case, despite the fact that the law at issue is a state statute determining eligibility for welfare benefits on the basis of alienage within an entirely state funded and implemented program, the commissioner contends that the state's sponsor income deeming regulation should be reviewed deferentially because it parallels federal welfare law. In support of her argument, the commissioner primarily relies on two United States Supreme Court cases: *De Canas* v. *Bica,* 424 U.S. 351, 96 S. Ct. 933, 47 L. Ed. 2d 43 (1976); and *Plyler* v. *Doe,* supra, 457 U.S. 202. The commissioner argues that these cases suggest that a state statute concerning aliens that is consistent with or mirrors a federal statute or policy, should be subject to the same standard of review as the federal law under an equal protection analysis. To the contrary, these cases indicate the court's willingness to conclude that particular state statutes are not unconstitutional under the supremacy clause[25] because they do not conflict with

---

[25] The constitution of the United States, article six, clause 2, provides in relevant part: "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme

the federal government's exercise of its plenary power within the realm of immigration and naturalization, or are not preempted by existing federal law. The commissioner's argument, therefore, must fail because both cases involved different constitutional challenges that implicated different interests and concerns regarding both legislative motivation and judicial review than does our review of the state action in the present case under an equal protection analysis. We are not concerned in this case with whether the state's alienage based classification conflicts with federal policy or power, but rather with whether the state has conditioned welfare benefits on a presumptively invidious trait in violation of the equal protection clause of the fourteenth amendment to the United States constitution.

In *De Canas* v. *Bica,* supra, 424 U.S. 352–53, the court addressed the issue of whether a California statute, prohibiting employers from knowingly hiring illegal aliens if that employment would adversely affect lawful resident workers, was "unconstitutional either because it [was] an attempt to regulate immigration and naturalization or because it [was] pre-empted under the Supremacy Clause, Art. VI, cl. 2, of the Constitution, by the Immigration and Nationality Act (INA), 66 Stat. 163, as amended, 8 U.S.C. § 1101 et seq., the comprehensive federal statutory scheme for regulation

---

Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."

"The supremacy clause mandates that federal law overrides, i.e., preempts, any state regulation where there is an actual conflict between the two sets of legislation such that both cannot stand, for example, if federal law forbids an act which state legislation requires. Moreover, where Congress acts pursuant to a plenary power, it may specifically prohibit parallel state legislation, i.e., occupy or preempt, the field." J. Nowak, R. Rotunda, & J. Young, Constitutional Law (2d Ed. 1983) p. 292. A supremacy clause challenge to state action, therefore, involves much different issues than does a challenge to state action under the equal protection clause.

of immigration and naturalization." The court upheld the statute on two grounds. First, the statute did not violate the supremacy clause because neither the plain language nor the legislative history of the INA revealed that the federal government intended thereby to preempt the states' ability to regulate the employment of their residents. Id., 356. Second, because the statute did not have a direct impact on immigration, it did not unconstitutionally encroach on the "[p]ower to regulate immigration [which] is unquestionably exclusively a federal power." Id., 354.

The court's conclusion that a state law that adopts federal standards does not violate the supremacy clause or the constitutional grant of power to regulate immigration does not implicate the validity of such a law under the equal protection clause of the fourteenth amendment. The fact that a state may act within a given realm provided it does not conflict with federal legislation does not also imply that when so acting it may make invidious distinctions without regard to the constitutional equal protection guarantee. Contrary to the commissioner's argument, therefore, the court's decision in De Canas does not suggest that, if a state law is consistent with a federal law, both should be subject to the same deferential level of scrutiny under an equal protection analysis, despite their differing interests.

The commissioner relies on Plyler v. Doe, supra, 457 U.S. 202, for the proposition that her broad reading of De Canas v. Bica, supra, 424 U.S. 351, has been incorporated into the federal equal protection jurisprudence. In Plyler v. Doe, supra, 223, the United States Supreme Court considered the constitutionality of a Texas statute that withheld state funds from local school districts for the education of children who were not legally admitted to the United States and allowed the school districts to deny such children enrollment.

Although the court declined to recognize either *"illegal* aliens" as a suspect class or education as a fundamental right,[26] it concluded that the statute violated the equal protection clause of the fourteenth amendment of the United States constitution. The court reasoned that the state's law "imposes a lifetime hardship on a discrete class of children not accountable for their disabling status," and therefore "can hardly be considered rational unless it furthers some substantial goal of the State." Id., 223, 224. While discussing the suspect status of illegal aliens and the plenary federal power to regulate immigration and naturalization, the court stated in a footnote: "No State may independently exercise a like power. But if the Federal Government has by uniform rule prescribed what it believes to be appropriate standards for the treatment of an alien subclass, the States may, of course, follow the federal direction. See *De Canas* v. *Bica,* [supra, 424 U.S. 351]." Id., 219 n.19.

The commissioner argues, on the basis of that language, that under its equal protection analysis the United States Supreme Court will deferentially review a state law regarding resident aliens as long as that law is consistent with a federal law. This argument lacks merit for two reasons. First, without any independent equal protection analysis, the court cites as authority *De Canas* v. *Bica,* supra, 424 U.S. 351, which, as discussed above, did not involve an equal protection claim, but rather entertained a supremacy clause challenge to a state law involving resident aliens. As a result, the quoted language must be read to delineate the extent to which the states may legislate with respect to illegal aliens without violating the supremacy

---

[26] Governmental classifications are strictly scrutinized when they result in inequalities with respect to the deprivation, distribution or accessibility of certain fundamental rights such as the right to vote, litigate, privacy and others. See L. Tribe, American Constitutional Law (2d Ed. 1988) § 16-7.

clause or interfering with Congress' exercise of its plenary power with respect to immigration and naturalization. Second, *Plyler* v. *Doe,* supra, 457 U.S. 226, did not involve a state statute that was authorized by federal law or followed a uniform federal rule prescribing the appropriate standards for the treatment of an alien subclass. The quoted language, thus, cannot be considered a controlling pronouncement of the court's opinion in a case where the federal government has authorized disparate treatment of resident aliens by the states. Therefore, the language relied on by the commissioner must be read either as dictum regarding the equal protection status of illegal aliens in a case where the state action is authorized by federal law, or more appropriately as dictum regarding federal preemption doctrine as applied to state laws that classify such aliens.

Moreover, insofar as *Plyler* v. *Doe,* supra, 457 U.S. 202, can be read to require deferential review of a state law that is explicitly authorized by Congress or carries out a uniform federal policy regarding immigration, it does not advance the commissioner's argument in this case. In order to implicate the federal separation of powers concerns that motivated the court in *De Canas* v. *Bica,* supra, 424 U.S. 351, it would not necessarily suffice for the provisions of state law to parallel those contained in federal law, if federal law has not authorized or required such state legislation.[27] As the com-

---

[27] Our conclusion that the state action at issue is neither explicitly nor implicitly authorized by federal law or policy makes it unnecessary for us to reach the issue of whether the federal government could indeed authorize the states to discriminate on the basis of alienage. We do, however, note that the Supreme Court has addressed this issue in *Graham* v. *Richardson,* supra, 403 U.S. 382. In that case, the court stated: "Although the Federal Government admittedly has broad constitutional power to determine what aliens shall be admitted to the United States, the period they may remain, and the terms and conditions of their naturalization, Congress does not have the power to authorize the individual States to violate the Equal Protection Clause. *Shapiro* v. *Thompson,* [394 U.S. 618, 641, 89 S. Ct. 1322, 22 L. Ed. 2d 600 (1969)]." Id.

missioner conceded at oral argument, the federal AFDC deeming laws do not contain any language authorizing or requiring the states to adopt similar laws regarding wholly state funded and administered welfare programs. Furthermore, the various federal deeming laws do not constitute a uniform federal immigration policy that a sponsor's income shall be attributed to a sponsored resident alien when determining that resident alien's eligibility for economic benefits distributed by the government. As the plaintiff correctly observes, Congress has chosen not to extend the AFDC deeming laws to all other federal benefits programs for which sponsored resident aliens are eligible. *Minino* v. *Perales,* 79 N.Y.2d 883, 885, 589 N.E.2d 385, 581 N.Y.S.2d 162 (1992). In the absence of a blanket policy of sponsor income deeming for all federal benefits programs, we cannot conclude that Congress impliedly has authorized or required the states to deem sponsor income to be available for resident aliens for purposes of eligibility for state run and funded benefits programs.

Accordingly, we are unpersuaded by the commissioner's claim that the United States Supreme Court has created an exception, for state laws that parallel federal laws, to the general rule that alienage-based state welfare laws are subject to strict scrutiny under the equal protection clause of the fourteenth amendment. The commissioner has also not convinced us that such an exception is implied or warranted under existing federal law. We conclude, therefore, that *Graham* v. *Richardson,* supra, 403 U.S. 365, and its progeny control this case.

B

We next address the commissioner's alternate claim that the statutory scheme in this case is not based on alienage and should therefore be rationally reviewed.

The commissioner argues that the statute classifies individuals "on the basis of [a] perceived need for assistance as a result of *sponsorship* and is subject to rational review, just as any other state welfare benefit statute." (Emphasis in original.) In support of her argument, the commissioner relies on *Geduldig* v. *Aiello,* 417 U.S. 484, 496 n.20, 94 S. Ct. 2485, 41 L. Ed. 2d 256 (1974), in which the United States Supreme Court held that a state's statutory exclusion of pregnancy related complications from a list of compensable disabilities, for purposes of a state run insurance program, was not a classification based on gender. The court reasoned that the statute created two classes of individuals, nonpregnant and pregnant persons, both of which had female members. As a result, the court concluded that the "program [did] not exclude anyone from benefit eligibility because of gender but merely remove[d] one physical condition—pregnancy—from the list of compensable disabilities." Id. Similarly, the commissioner argues that because the state statute and regulation do not burden all aliens but only those that are sponsored, they do not result in a classification based on alienage.

Three years after the court's decision in *Geduldig* v. *Aiello,* supra, 417 U.S. 484, the court rejected identical reasoning as applied to a state statute that barred resident alien students from a state run financial aid program unless they had filed an application to become a citizen or had filed a statement of intent to apply for United States citizenship once eligible. *Nyquist* v. *Mauclet,* supra, 432 U.S. 1. Relying on *Graham* v. *Richardson,* supra, 403 U.S. 365, the court stated: "The important points are that [the statute] is directed at aliens and that only aliens are harmed by it. The fact that the statute is not an absolute bar does not mean that it does not discriminate against the class." *Nyquist* v. *Mauclet,* supra, 10. Accordingly, the court then sub-

jected the state's law to strict scrutiny and concluded that it violated the equal protection clause of the fourteenth amendment.

Applying these principles to the present case, we reject the commissioner's argument. General Statutes § 17-273 (d) and § 17-3a-14 (D) (8) of the Regulations of Connecticut State Agencies are by their specific terms directed only at aliens. In addition, the fact that their reach encompasses only sponsored aliens is irrelevant, as only aliens will be affected by them. We conclude, therefore, that § 17-273 (d) and § 17-3a-14 (D) (8) create a presumptively invidious state law classification based on alienage. As such, the statute and regulation are subject to strict scrutiny under the equal protection clause of the fourteenth amendment.

## II

Our inquiry does not end with the determination that the statute and regulation should be strictly scrutinized. Although the commissioner has never asserted that the scheme satisfies strict scrutiny; see footnote 13; we must nevertheless determine whether the state's deeming scheme is closely related to the accomplishment of a compelling governmental interest. In her briefs to this court and at oral argument, the commissioner has claimed only that the statute is rationally related to a legitimate government interest. The commissioner argues that the government has a legitimate interest in preserving the "economic and social welfare of the state."[28] She further contends that deeming sponsor

[28] It is undisputed that General Statutes § 17-273 (d) was enacted in 1991 in order to reduce the costs associated with maintaining the welfare of Connecticut's needy population and thereby maintain the fiscal integrity of the department of income maintenance in recessionary times. As the state correctly asserts in its brief: "There is ample evidence in the legislative history of this provision that the reason the legislature enacted this and other sections of [Public Acts, Spec. Sess., June, 1991, No. 91-8, § 36 (P.A. 91-8)] was to save money for the state." Indeed, the legislative history of P.A. 91-8

income to be available for a sponsored alien is a rational means by which to achieve this goal because it conditions eligibility on "a reasonable assumption of support that may not be accurate in every case."[29] Applying strict scrutiny to the state's deeming scheme, we conclude that the claimed governmental interest is not compelling. Accordingly, we decide that the trial court properly concluded that General Statutes § 17-273 (d) and § 17-3a-14 (D) (8) of the Regulations of Connecticut State Agencies are unconstitutional.

reveals a decidedly cost conservative bent. Regarding the enactment of the act, Senator Kenneth L. Przybysz stated: "It is not something that I and many people look forward to adopting, however, it is necessary in these very difficult times, considered a fiscal crisis here in our State . . . ." 34 S. Proc., Pt. 14, 1991 Spec. Sess., p. 450. In addition Senator Kevin B. Sullivan stated: "[I]n hard times we must make hard decisions but we have to make them with care, compassion, with thought, [and] with understanding. . . . Not easy choices, painful choices, the ones that are necessary for the fiscal health of this State . . . ." Id., pp. 512–13.

A number of the commissioner's arguments also imply that consistency with federal immigration and naturalization law is a legitimate goal of the deeming scheme. We need not consider this claimed governmental interest, for two reasons. First, the commissioner has failed to identify and our research has failed to reveal any implied or express federal policy that sponsor income be deemed available to a sponsored alien when determining eligibility for the distribution of all economic benefits. As a result, the state is without authority to act in this exclusively federal domain. See *De Canas* v. *Bica,* supra, 424 U.S. 354. Second, even if such authorization existed, the legislative history of P.A. 91-8 forecloses any attempt by the state to argue that its law was enacted to further federal immigration policy. It is clear from the language quoted above that this is not a statute regarding immigration and naturalization, but is a welfare statute concerning who receives essential benefits.

[29] Our conclusion that the governmental interest is not compelling obviates the need for us to decide whether the state's scheme is narrowly tailored to achieve its objective. We note, however, that it is difficult to see the relationship between the state's goal and its scheme that presumptively deems to an alien a sponsor's income despite the undisputed fact that the alien neither has actually received nor has actual access to any of the sponsor's assets. Our skepticism is heightened by the fact that the relationship on which the presumption rests, sponsorship, is one that is not legally enforceable by the person to whom the inaccessible income is deemed. See footnote 18.

In order to pass strict scrutiny, state action must be closely related to a compelling governmental interest. See, e.g., *Graham* v. *Richardson,* supra, 403 U.S. 376.[30] It is well established that "a state has a valid interest in preserving the fiscal integrity of its programs. It may legitimately attempt to limit its expenditures, whether for public assistance, public education, or any other program. But a State may not accomplish such a purpose by invidious distinctions between classes of its citizens." *Shapiro* v. *Thompson,* 394 U.S. 618, 633, 89 S. Ct. 1322, 22 L. Ed. 2d 600 (1969). In *Graham* v. *Richardson,* supra, 375, the court extended this reasoning to a state law distinction based on alienage, stating: "Since an alien as well as a citizen is a 'person' for equal protection purposes, a concern for fiscal integrity is no more compelling a justification for the questioned classification in these cases than it was in *Shapiro.*" The court further noted that preservation of the state fisc was not a compelling interest particularly in light of the fact that aliens, like citizens, pay taxes that contribute to the state's programs and may live in the state for extended periods working and contributing to the state's economic development. Id., 376. Accordingly, the commissioner's claim that the state's deeming scheme is justified by a desire to preserve the economic welfare of the state is not compelling and is inadequate to withstand the plaintiff's equal protection challenge. We conclude, therefore, that the trial court properly determined that General Statutes § 17-273 (d) and § 17-3a-14 (D) (8) of the Regulations of Connecticut

---

[30] "Only rarely are statutes sustained in the face of strict-scrutiny. As one commentator observed, strict-scrutiny review is 'strict' in theory but usually 'fatal' in fact. Gunther, The Supreme Court, 1971 Term—Forward: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection, 86 Harv. L. Rev. 1, 8 (1972)." *Bernal* v. *Fainter,* supra, 476 U.S. 219 n.6; but see *Korematsu* v. *United States,* supra, 323 U.S. 214 (discrimination against people of Japanese ancestry upheld on the ground that it was a "military imperative" during World War II).

State Agencies violate the equal protection clause of the fourteenth amendment to the United States constitution.

The judgment is affirmed.

In this opinion the other justices concurred.