HONG PHAM *v.* MICHAEL P. STARKOWSKI,
COMMISSIONER OF SOCIAL SERVICES
(SC 18582)

Rogers, C. J., and Norcott, Palmer, Zarella, McLachlan and Eveleigh, Js.

Argued November 30, 2010—officially released April 5, 2011

*Hugh Barber,* assistant attorney general, with whom, on the brief, were *Richard Blumenthal,* former attorney general, and *Deeona Gaskin,* law student intern, for the appellant (defendant).

*Nicholas P. Yorio,* with whom were *Susan Garten* and, on the brief, *Gregory L. Bass,* for the appellee (plaintiff).

*Mara Youdelman* and *Tanya Broder* filed a brief for the National Health Law Program et al. as amici curiae.

*Opinion*

ZARELLA, J. This appeal arises from a class action lawsuit filed by the plaintiff, Hong Pham, individually and on behalf of all others similarly situated, against the defendant, Michael P. Starkowski, the commissioner of social services, challenging the constitutionality of Public Acts, Spec. Sess., September, 2009, No. 09-5, §§ 55[1] and 64[2] (Spec. Sess. P.A. 09-5), which effectively terminated certain state funded medical assistance for members of the class who are all legal immigrants residing in the state, who are in need of publicly funded

[1] Public Acts, Spec. Sess., September, 2009, No. 09-5, § 55, which is codified as amended at General Statutes § 17b-192, provides in relevant part: "(a) The Commissioner of Social Services shall implement a state medical assistance component of the state-administered general assistance program for persons who do not meet the categorical eligibility criteria for Medicaid on the basis of age, blindness, disability, pregnancy, being a parent or other caretaker relative of a dependent child, being a child under the age of twenty-one, or having been screened for breast or cervical cancer under the Centers for Disease Control and Prevention's National Breast and Cervical Cancer Early Detection Program and are found to need treatment for either breast or cervical cancer. . . ."

[2] Public Acts, Spec. Sess., September, 2009, No. 09-5, § 64, which is codified at General Statutes § 17b-257b, provides in relevant part: "(a) Qualified aliens, as defined in Section 431 of Public Law 104-193, admitted into the United States on or after August 22, 1996, other lawfully residing immigrant aliens or aliens who formerly held the status of permanently residing under color of law who are (1) receiving home care services, (2) receiving nursing facility care under the state-funded medical assistance program on September 8, 2009, shall continue to receive coverage for such services or care for as long as the individual meets Medicaid eligibility requirements for such services or care except for alien status, or (3) are receiving nursing facility care and have applied for state-funded medical assistance before September 8, 2009, and would otherwise be eligible for such assistance, shall be provided such assistance for as long as the individual meets Medicaid eligibility requirements for nursing facility care except for alien status, except such aliens who are (A) children and pregnant women, and (B) whose date of admission is less than five years before the date services are provided shall receive coverage until such time as the state plan amendment concerning federal funding for the provision of services to such aliens is approved. . . ."

medical assistance and who have resided in the United States for fewer than five years. The defendant appeals[3] from the judgment of the trial court, which granted the plaintiff's request for class certification and concluded that §§ 55 and 64 of Spec. Sess. P.A. 09-5 violate the equal protection clause of the fourteenth amendment to the United States constitution[4] because those sections impermissibly discriminate against the class members[5] on the basis of their status as legal aliens. The trial court permanently enjoined the defendant from enforcing the challenged sections of Spec. Sess. P.A. 09-5. On appeal, the defendant claims that the trial court incorrectly concluded that §§ 55 and 64 of Spec. Sess. P.A. 09-5 discriminate against the class members on the basis of alienage. Alternatively, the defendant claims that, if §§ 55 and 64 of Spec. Sess. P.A. 09-5 do discriminate on the basis of alienage, the trial court improperly applied strict scrutiny review in reaching its conclusions because the unique circumstances of this case demonstrate that such discrimination is subject only to a more deferential rational basis standard of review rather than the traditional, more searching strict scrutiny review normally applied to state classifications based on alienage. The plaintiff responds that the trial court correctly concluded that §§ 55 and 64 of Spec. Sess. P.A. 09-5 violate the equal protection clause of the fourteenth amendment and claims, as an alternative ground for affirming the judgment of the trial court, that the chal-

---

[3] The defendant appealed from the judgment of the trial court to the Appellate Court. Thereafter, the chief clerk of the Supreme and Appellate Courts transferred the appeal to this court pursuant to Practice Book § 65-4 and General Statutes § 51-199 (b) (2), the latter of which requires that an appeal from a judgment of the Superior Court invalidating a state statute be filed directly with this court.

[4] The fourteenth amendment to the United States constitution, § 1, provides in relevant part: "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."

[5] References to the class or class members without immediate mention of the plaintiff include the plaintiff as well as all members of the class.

lenged sections of Spec. Sess. P.A. 09-5 also violate article first, § 20, of the constitution of Connecticut.[6] We reverse the judgment of the trial court.

## I

## FACTS, LEGISLATIVE BACKGROUND AND PROCEDURAL HISTORY

The plaintiff and all class members are legal aliens who claim to be in need of publicly funded, nonemergency medical assistance (medical assistance)[7] because they are indigent but are ineligible for such assistance through the federal Medicaid program, which bars aliens who have resided in the United States for fewer than five years from participating. Prior to December 1, 2009, the state provided medical assistance to these individuals through the state medical assistance for noncitizens program (SMANC).[8] See Public Acts, Spec. Sess., June, 1997, No. 97-2, § 146 (Spec. Sess. P.A. 97-2), codified as amended at General Statutes (Rev. to 2009) § 17b-257b. In response to budgetary concerns, however, the legislature, in 2009, passed Spec. Sess. P.A. 09-5, which substantially repealed SMANC and altered the statutory eligibility requirements for the state administered general assistance medical program (SAGA-medical), effectively eliminating all state funded medical assistance for the class members as of December 1, 2009.[9] The plaintiff claims that this action by the

---

[6] Article first, § 20, of the constitution of Connecticut provides: "No person shall be denied the equal protection of the law nor be subjected to segregation or discrimination in the exercise or enjoyment of his civil or political rights because of religion, race, color, ancestry or national origin."

[7] The class members remain eligible for emergency medical assistance under federal Medicaid.

[8] Coverage under SMANC included prescription medications, scheduled visits to a physician, laboratory tests, medical transportation, hospitalization, mental health care and nursing home care.

[9] The defendant, in his capacity as the commissioner of social services, administers each of these programs. See General Statutes §§ 17b-192, 17b-257b and 17b-260.

state discriminates against her and the class members on the basis of their status as aliens, in violation of the federal and state constitutions.

The issues presented in this appeal require an examination of a number of state and federal medical assistance programs and a number of state and federal statutory provisions affecting those programs. For this reason, we first set forth an overview of the statutory programs and relevant legislation at issue before turning to the trial court proceedings and our analysis of the specific claims of the parties.

A

Federal Medicaid Program

The federal government created the federal Medicaid program through the enactment of Title XIX of the Social Security Amendments of 1965, Pub. L. No. 89-97, § 121, 79 Stat. 286, 343–52, codified as amended at 42 U.S.C. § 1396 et seq. (2006 and Sup. III 2009). Federal Medicaid is an optional federal and state cooperative medical assistance program pursuant to which a state that elects to participate receives federal funding to assist it in providing publicly funded medical assistance to certain groups of indigent individuals who meet eligibility criteria and possess at least one of the categorical eligibility characteristics generally required for coverage.[10] The phrase "categorical eligibility" generally refers to those who are disabled, blind, pregnant, a parent of a dependent child, or an individual under twenty-one years of age or sixty-five years of age or older. See 42 U.S.C. §§ 1396a (a) (10) and 1396d (a) (2006 and Sup. III 2009); see also 42 C.F.R. § 435.100

---

[10] Beyond those groups of individuals who are categorically eligible, the federal Medicaid program does allow for the provision of optional coverage to certain other groups of individuals. See 42 U.S.C. § 1396a (2006 and Sup. III 2009). Such optional coverage, however, is not relevant to the issues presented by this appeal.

et seq. (2010). The members of the class all meet the categorical eligibility requirements for federal Medicaid.

Federal law governs the federal Medicaid program and determines the eligibility requirements for that program. See, e.g., *K & A Radiologic Technology Services, Inc.* v. *Commissioner of the Dept. of Health*, 189 F.3d 273, 277 (2d Cir. 1999). States that adopt federal Medicaid agree to administer the program in accordance with federal law and regulations in order to receive a substantial reimbursement from the federal government to subsidize the cost of the program. See id.; see also 42 U.S.C. § 1396a (a) (2006). Federal Medicaid provides the states certain options for coverage, and each state is required to submit its own plan that outlines the terms of the state's participation in the federal Medicaid program. See 42 U.S.C. § 1396a (a) (2006). The federal government must approve that plan before the state may participate. See 42 U.S.C. §§ 1396 and 1396a (b) (2006 and Sup. III 2009). Although the amount of federal funding varies by state, Connecticut, which, in 1965, authorized the state to participate in the federal Medicaid program; see Public Acts 1965, No. 357, § 1; currently receives a reimbursement from the federal government at a rate of approximately 50 percent of the cost of Connecticut's federal Medicaid program.[11] Cf. 42 U.S.C. § 1396d (b) (2006). The General Assembly has charged the defendant with administering federal Medicaid, in accordance with federal laws and regulations. See General Statutes § 17b-260. Until 1996, federal Medicaid provided assistance to many indigent individuals meeting the categorical eligibility requirements without regard to citizenship status or durational residency requirements.

---

[11] According to the plaintiff, "[i]n . . . fiscal year [2008–2009], the state . . . paid [approximately] $3.8 billion for medical services [provided under] and [the] administration [of] the Medicaid program, at least half of which is reimbursable by the federal government."

On August 22, 1996, Congress enacted the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (Welfare Reform Act), Pub. L. No. 104-193, 110 Stat. 2105, which, as President William J. Clinton put it, was designed to "end welfare as we know it . . . ." (Internal quotation marks omitted.) P. Kilborn & S. Verhovek, "Clinton's Welfare Shift Ends Tortuous Journey," N.Y. Times, August 2, 1996, p. A1. Title IV of the Welfare Reform Act substantially impacted the provision of public welfare assistance to certain immigrants. See generally 8 U.S.C. § 1601 et seq. (2006 and Sup. III 2009). In enacting the Welfare Reform Act, Congress included several statements regarding national immigration policy indicating that Congress favored self-sufficiency by immigrants, immigrants were applying for and receiving public assistance at greater rates and, through the Welfare Reform Act, Congress intended to discourage immigrants from relying on publicly funded assistance. 8 U.S.C. § 1601 (2006).[12]

---

[12] Title 8 of the United States Code, § 1601, provides: "The Congress makes the following statements concerning national policy with respect to welfare and immigration:

"(1) Self-sufficiency has been a basic principle of United States immigration law since this country's earliest immigration statutes.

"(2) It continues to be the immigration policy of the United States that—

"(A) aliens within the Nation's borders not depend on public resources to meet their needs, but rather rely on their own capabilities and the resources of their families, their sponsors, and private organizations, and

"(B) the availability of public benefits not constitute an incentive for immigration to the United States.

"(3) Despite the principle of self-sufficiency, aliens have been applying for and receiving public benefits from Federal, State, and local governments at increasing rates.

"(4) Current eligibility rules for public assistance and unenforceable financial support agreements have proved wholly incapable of assuring that individual aliens not burden the public benefits system.

"(5) It is a compelling government interest to enact new rules for eligibility and sponsorship agreements in order to assure that aliens be self-reliant in accordance with national immigration policy.

"(6) It is a compelling government interest to remove the incentive for illegal immigration provided by the availability of public benefits.

"(7) With respect to the State authority to make determinations concerning the eligibility of qualified aliens for public benefits in this chapter, a State

Whether an alien is eligible for public assistance depends on a number of factors, including whether the alien entered the country lawfully, the particular legal status under which the alien entered, the date that the alien entered, and the amount of time that the alien has resided in the United States. See 8 U.S.C. §§ 1612, 1613, 1621, 1622 and 1641 (b) (2006 and Sup. III 2009). The Welfare Reform Act divides aliens into two groups: qualified and nonqualified aliens. See 8 U.S.C. § 1641 (b) (2006) (defining "qualified alien"). Qualified aliens are generally those aliens lawfully admitted to the United States for permanent residence and those admitted pursuant to certain statutes. 8 U.S.C. § 1641 (b) (2006). Any alien not considered a qualified alien is a nonqualified alien, which includes illegal aliens. See 8 U.S.C. § 1641 (b) (2006). All nonqualified aliens are ineligible for federal public assistance, including federal Medicaid, subject to certain exceptions.[13] 8 U.S.C. § 1611 (a) and (b) (2006). The class members in the present case are all qualified aliens.

The Welfare Reform Act further distinguishes qualified aliens depending on their length of residency in the United States. Any qualified alien who has resided in the United States for five or more years is eligible for federal public assistance. See 8 U.S.C. § 1613 (a) (2006). Aliens who have resided in the United States for fewer than five years, however, generally are barred from receiving federal public assistance until they have resided in the United States for five years (five year

that chooses to follow the Federal classification in determining the eligibility of such aliens for public assistance shall be considered to have chosen the least restrictive means available for achieving the compelling governmental interest of assuring that aliens be self-reliant in accordance with national immigration policy."

[13] For example, nonqualified aliens are entitled to emergency medical care under federal Medicaid. See 42 U.S.C. § 1396b (v) (2) and (3) (2006).

rule).[14] See 8 U.S.C. § 1613 (a) (2006); but see 8 U.S.C. § 1613 (b) (2006) (providing exceptions to five year rule). Federal law thus requires states to deny federal Medicaid coverage to qualified aliens who are barred from participating by the five year rule.[15] Additionally, the Welfare Reform Act similarly authorizes states to deny state funded public assistance to certain qualified aliens. 8 U.S.C. §§ 1622 (a) and 1624 (2006). The class members meet the categorical eligibility requirements for participation in federal Medicaid but are barred from receiving federal Medicaid assistance because they have resided in the United States for fewer than five years.

## B

### State Medical Assistance for Noncitizens Program (SMANC)

In response to the federal government's adoption of the five year rule in the Welfare Reform Act, this state, in 1997, created SMANC, a state funded program that afforded medical coverage exclusively to qualified aliens who otherwise were categorically eligible for federal Medicaid but who were barred from participating in federal Medicaid because of the federal five year rule. Spec. Sess. P.A. 97-2, § 146. Essentially, SMANC covered those indigent aliens who otherwise met the categorical eligibility requirements for federal Medicaid because they were blind, disabled, pregnant, a parent of a dependent child, or under the age of twenty-one

---

[14] Following the passage of the Children's Health Insurance Program Reauthorization Act of 2009, Pub. L. No. 111-3, § 214, 123 Stat. 8, 56–57, federal law now permits those qualified aliens who are under twenty-one years of age or who are pregnant to participate in federal Medicaid notwithstanding the five year rule, which otherwise would prevent their participation. No class member in the present case belongs to one or both of these groups. See footnote 18 of this opinion.

[15] Connecticut's adoption of the five year rule is codified at General Statutes § 17b-257a (a).

or sixty-five years of age or older, but who lost their federal Medicaid coverage as a result of the federal five year rule. Because SMANC covered only this subgroup of aliens, no citizens and no aliens who had resided in the United States for five or more years could participate in SMANC. See General Statutes (Rev. to 2009) § 17b-257b. Prior to the adoption of Spec. Sess. P.A. 09-5, § 64, SMANC provided coverage similar to that provided by federal Medicaid but was administered and funded exclusively by the state. In response to budget concerns in 2009, the legislature enacted Spec. Sess. P.A. 09-5, § 64, which substantially eliminated SMANC and effectively terminated publicly funded medical assistance for most recipients, including all of the class members in the present case. Following the enactment of Spec. Sess. P.A. 09-5, § 64, SMANC continues to be funded and administered entirely by the state but currently provides assistance to only those recipients who either have received or applied for nursing facility or home care prior to the enactment of Spec. Sess. P.A. 09-5, § 64.[16] See General Statutes § 17b-257b. There are no individuals in the class who presently qualify for SMANC.

C

State Administered General Assistance
Medical Program (SAGA-medical)

In addition to federal Medicaid, state law provides for a separate, state medical assistance program, commonly referred to as SAGA-medical, which provides coverage for certain categories of indigent individuals who do not meet the categorical eligibility requirements

---

[16] Section 64 of Spec. Sess. P.A. 09-5 also continued SMANC funding for those aliens who are pregnant or under the age of twenty-one. These individuals are now covered under federal Medicaid pursuant to a subsequent amendment to the federal five year rule. See Children's Health Insurance Program Reauthorization Act of 2009, Pub. L. No. 111-3, § 214, 123 Stat. 8, 56–57.

for federal Medicaid. See General Statutes § 17b-192 (a). Before the legislature enacted Spec. Sess. P.A. 09-5, the SAGA-medical statute provided that coverage under that program would be available to "persons ineligible for [federal] Medicaid." General Statutes (Rev. to 2009) § 17b-192 (a). Through the enactment of Spec. Sess. P.A. 09-5, § 55, the legislature altered the statutory eligibility requirements for SAGA-medical such that it currently provides coverage to only those indigent individuals who do not meet the categorical eligibility requirements for federal Medicaid. General Statutes § 17b-192 (a). Unlike federal Medicaid, SAGA-medical has no citizenship or United States residency requirements. See generally General Statutes § 17b-192. Thus, SAGA-medical provides coverage to citizens and indigent qualified aliens who do not meet the categorical eligibility requirements of federal Medicaid.[17] Because the class members are categorically eligible for federal

---

[17] We note that, since the trial in the present case, the nature of SAGA-medical has substantially changed as a result of the federal Patient Protection and Affordable Care Act, Pub. L. No. 111-148, § 2001, 124 Stat. 119, 271–79 (2010), such that SAGA-medical is now at least partially funded and controlled by the federal government. The parties did not provide any significant briefing regarding these changes, and these changes do not appear to affect the issues in this appeal. Significantly, we note that the Patient Protection and Affordable Care Act did not affect the eligibility of the class members to receive federal Medicaid or to qualify for any of the other programs at issue. In the interest of simplicity, we refer to SAGA-medical as it existed at the time of the trial in the present case.

We also note that it appears that SAGA-medical has been entirely replaced by the new Medicaid for Low Income Adults program (Medicaid-LIA), which was established by the Patient Protection and Affordable Care Act, insofar as SAGA-medical is no longer entirely controlled or funded by the state. See Patient Protection and Affordable Care Act, Pub. L. No. 111-148, § 2001 (a) (4) (A), supra, 124 Stat. 274; Public Acts 2010, No. 10-3, § 23; Public Acts, Spec. Sess., June, 2010, No. 10-1, §§ 23 and 24 (Spec. Sess. P.A. 10-1). Although the full impact of these changes is not clear, we note the statutory language in § 55 of Spec. Sess. P.A. 09-5 governing SAGA-medical has remained undisturbed notwithstanding the recent changes to SAGA-medical, and state law requires the defendant to operate the Medicaid-LIA program in accordance with the eligibility requirements for SAGA-medical, to the extent possible. See Spec. Sess. P.A. 10-1, § 24.

Medicaid, they are ineligible for coverage under SAGA-medical.

The class members currently are ineligible for any of these publicly funded medical assistance programs. The class members are barred from receiving federal Medicaid because of the five year rule in the Welfare Reform Act. They are ineligible for assistance under SMANC because Spec. Sess. P.A. 09-5, § 64, substantially repealed SMANC, thereby eliminating its coverage for the class members. Furthermore, the class members are ineligible for SAGA-medical because they are categorically eligible for federal Medicaid notwithstanding the federal five year rule, which bars them from participating in federal Medicaid. In the present case, the plaintiff challenges only the latter two eligibility limitations and not the federal five year rule in the Welfare Reform Act.

D

Proceedings in the Trial Court

On December 1, 2009, the plaintiff filed a lawsuit, which subsequently was certified as a class action, seeking to enjoin the defendant from enforcing §§ 55 and 64 of Spec. Sess. P.A. 09-5. The plaintiff claimed that those sections unlawfully discriminate against her and others similarly situated because of their status as aliens, in violation of the equal protection clauses of the federal and state constitutions.

The plaintiff claimed that Spec. Sess. P.A. 09-5, §§ 55 and 64, discriminated against her on the basis of her alienage because similarly situated citizens continued to receive publicly funded medical assistance through the federal Medicaid program, whereas she no longer received such assistance as a result of the implementation of Spec. Sess. P.A. 09-5, §§ 55 and 64. The plaintiff further claimed that case law required courts to apply

strict scrutiny to state classifications based on alienage and that the state could not establish a sufficient justification for the challenged classification. For this reason, the plaintiff sought a declaration that the challenged sections of Spec. Sess. P.A. 09-5 were unconstitutional and an injunction preventing their enforcement.

The defendant responded that §§ 55 and 64 of Spec. Sess. P.A. 09-5 do not discriminate on the basis of alienage. Specifically, the defendant argued that § 64, which substantially eliminated SMANC, an alien-only medical assistance program, did not discriminate against aliens in favor of similarly situated citizens because only aliens, and not citizens, could participate in the program, and, consequently, the state did not provide assistance to any citizens through that program. The defendant also argued that § 55, which amended the statutory eligibility requirements for SAGA-medical in a way that barred participation by the plaintiff, did not discriminate on the basis of alienage because the eligibility requirements for that program are not based on citizenship status and apply equally to citizens and aliens alike. The defendant further contended that, even if it was assumed that §§ 55 and 64 of Spec. Sess. P.A. 09-5 did discriminate against aliens, a court should review those sections to determine only whether the legislature had a rational basis for enacting those sections rather than use the strict scrutiny analysis traditionally applied to state classifications based on alienage. The defendant, citing recent case law from other jurisdictions, argued that rational basis review was proper because the federal government, under its broad constitutional authority to regulate immigration, had validly authorized any discriminatory treatment by the states in the provision of state funded medical assistance. It is undisputed that, if a court subjected the challenged provisions to rational basis review, they would survive such review, and, conversely, if a court applied strict scrutiny, those provi-

sions would not survive such scrutiny. Thus, resolution of the dispute turned on whether §§ 55 and 64 of Spec. Sess. P.A. 09-5 discriminated on the basis of alienage and, if they did, whether a court should subject the purported classification that they create to rational basis review or strict scrutiny.

The case was tried to the court in December, 2009, with the parties offering two joint stipulations of fact describing the relevant characteristics of the class members and the legislative background, as well as extensive oral and written arguments. On December 18, 2009, the trial court issued a memorandum of decision, in which it certified the plaintiff's action as a class action and concluded that the challenged sections of Spec. Sess. P.A. 09-5 violated the federal constitution. The trial court certified the class to include those legal aliens who (1) have resided in the United States for fewer than five years, (2) otherwise would be eligible for federal Medicaid but for the federal five year rule, and (3) have lost their state funded medical care as a result of the implementation of Spec. Sess. P.A. 09-5, §§ 55 and 64.[18]

The trial court then concluded that Spec. Sess. P.A. 09-5, §§ 55 and 64, discriminated against the class members on the basis of their status as aliens because the challenged provisions eliminated state funded medical assistance to the class whereas similarly situated citizens continued to receive publicly funded medical assistance through federal Medicaid. Having concluded that

---

[18] The trial court defined the class as follows: "All legal non-citizens who: (1) have been in the United States for less than five years; (2) are not pregnant; (3) are over the age of twenty-one; (4) meet all requirements for the federal Medicaid program other than those relating to citizenship or presence in the United States for more than five years; (5) as of September 8, 2009, were not in receipt of, or had an application pending for, home care services or nursing facility care; and (6) would be eligible for state funded medical assistance but for the implementation of Spec. Sess. P.A. 09-05, §§ 55, 64." The defendant has not challenged the trial court's decision to certify the plaintiff's action as a class action.

§§ 55 and 64 of Spec. Sess. P.A. 09-5 discriminated on the basis of alienage, the trial court further concluded that the federal government's authorization to the states to discriminate against aliens in determining eligibility for state funded medical assistance could not shield the state's classification from strict scrutiny review. Upon applying strict scrutiny, the trial court concluded that the state had not established a compelling government interest in drawing the classification between aliens and citizens and that §§ 55 and 64 of Spec. Sess. P.A. 09-5 violated the equal protection clause of the federal constitution. The trial court did not address the plaintiff's claims under the state constitution. Thereafter, the trial court rendered judgment in favor of the plaintiff and permanently enjoined the defendant from enforcing the challenged provisions.[19] This appeal by the defendant followed.

II

FEDERAL EQUAL PROTECTION CLAIM

The defendant claims that the trial court incorrectly concluded that §§ 55 and 64 of Spec. Sess. P.A. 09-5 violate the equal protection clause of the fourteenth amendment to the United States constitution. The defendant specifically claims that the challenged provisions do not discriminate on the basis of alienage, and, therefore, the court should review the classifications created by those provisions to determine only whether the legislature had a rational basis for enacting them. The plaintiff responds that §§ 55 and 64 facially discrim-

---

[19] Sections 55 and 64 of Spec. Sess. P.A. 09-5 took effect on December 1, 2009. Thus, when the trial court issued the injunction on December 18, 2009, the changes to the programs at issue already had taken effect. Thus, in purporting to issue a negative injunction preventing the defendant from enforcing §§ 55 and 64 of Spec. Sess. P.A 09-5, the trial court effectively was issuing an affirmative injunction requiring the resurrection of those statutory provisions that the legislature already had repealed through its passage of Spec. Sess. P.A. 09-5, §§ 55 and 64.

inate against aliens and that they should be subjected to strict scrutiny review. We agree with the defendant that §§ 55 and 64 do not discriminate on the basis of alienage, and, therefore, we do not reach the issue of whether a court should apply rational basis review or strict scrutiny to state classifications based on alienage that are authorized by the federal government.[20]

We begin with the standard of review and relevant equal protection principles. A facial challenge to the constitutionality of a statute presents questions of law over which our review is plenary. See, e.g., *Kerrigan* v. *Commissioner of Public Health*, 289 Conn. 135, 155, 957 A.2d 407 (2008). To establish a claim of facial invalidity, the party challenging the statute must demonstrate "that the law is invalid in toto—and therefore incapable of any valid application." (Internal quotation marks omitted.) *State* v. *McKenzie-Adams*, 281 Conn. 486, 499, 915 A.2d 822, cert. denied, 552 U.S. 888, 128 S. Ct. 248, 169 L. Ed. 2d 148 (2007). "[A] validly enacted statute carries with it a strong presumption of constitutionality, [and] those who challenge its constitutionality must sustain the heavy burden of proving its unconstitutionality beyond a reasonable doubt. . . . The court will indulge in every presumption in favor of the statute's constitutionality . . . . Therefore, [w]hen a question of constitutionality is raised, courts must approach it with caution, examine it with care, and sustain the

---

[20] The defendant appears to claim that the plaintiff's facial challenge to §§ 55 and 64 of Spec. Sess. P.A. 09-5 must fail because the "text" of those provisions does not discriminate against aliens. To the extent that the defendant claims that this court must restrict its review to the text of the provision in the context of a facial challenge to the constitutionality of a statute, we reject this argument. Our review of a facial challenge is not limited to the text of a statute but also may extend to any potential application of that statute. See *State* v. *McKenzie-Adams*, 281 Conn. 486, 499, 915 A.2d 822, cert. denied, 552 U.S. 888, 128 S. Ct. 248, 169 L. Ed. 2d 148 (2007). Thus, even if the text of a statute appears to be valid, a statute nevertheless may be found unconstitutional on the basis of a facial challenge if we conclude that the statute in question is incapable of *any* valid application. See id.

legislation unless its invalidity is clear." (Internal quotation marks omitted.) Id., 500.

The equal protection clause of the fourteenth amendment to the United States constitution provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const., amend. XIV, § 1. Courts have interpreted the term "person" in this provision to include aliens as well as citizens within the jurisdiction of the state in which they reside. *Graham* v. *Richardson*, 403 U.S. 365, 371, 91 S. Ct. 1848, 29 L. Ed. 2d 534 (1971); *Barannikova* v. *Greenwich*, 229 Conn. 664, 675, 643 A.2d 251 (1994). To prevail on an equal protection claim, the plaintiff first must establish that the state is affording different treatment to similarly situated groups of individuals. See, e.g., *Stuart* v. *Commissioner of Correction*, 266 Conn. 596, 602, 834 A.2d 52 (2003). "Thus, [t]o implicate the equal protection [clause] . . . it is necessary that the state statute . . . in question, either on its face or in practice, treat persons standing in the same relation to it differently." (Internal quotation marks omitted.) Id. "[I]t is only after this threshold requirement is met that the court will consider whether the statute survives scrutiny under the equal protection clause." Id., 602 n.10. Mindful of these principles, we address the constitutionality of each of the challenged sections of Spec. Sess. P.A. 09-5, beginning with § 64.

A

Challenge to Spec. Sess. P.A. 09-5, § 64

The defendant claims that the trial court incorrectly concluded that § 64 of Spec. Sess. P.A. 09-5, which substantially eliminated SMANC, discriminates on the basis of alienage. In support of this claim, the defendant argues that § 64 does not discriminate against aliens in favor of similarly situated citizens because only aliens, and not citizens, ever were eligible for SMANC. The

defendant further contends that the trial court improperly looked beyond the *state* funded program at issue and improperly compared the treatment of the class members under § 64 with the federal government's treatment of individuals under the separate *federal* Medicaid program. The defendant maintains that, because the state does not have to remediate the effects of the federal Welfare Reform Act, the equal protection clause does not require the states to "fill the gap" in coverage for the class members that the federal government had created under the Welfare Reform Act. The defendant further argues that, because the equal protection clause does not require the state to provide its residents with coverage under SMANC, the substantial elimination of that program cannot violate the equal protection clause. The plaintiff responds that the trial court correctly concluded that § 64 discriminates on the basis of alienage because it deprives the class members of publicly funded medical assistance while similarly situated citizens continue to receive such assistance under federal Medicaid. We agree with the defendant.

We conclude that, in substantially eliminating SMANC, the state did not draw a classification on the basis of alienage because that program does not benefit citizens as opposed to aliens. To draw a classification on the basis of alienage, the state statute in question typically must afford some benefit to citizens but deny that benefit to at least some aliens because of their status as noncitizens. Decisions of the United States Supreme Court are instructive on this issue. For example, in *Graham* v. *Richardson*, supra, 403 U.S. 365, the court invalidated statutes in two different states that provided for public assistance to citizens but denied such assistance to aliens simply on the basis of their citizenship status. Id., 376. One state statute precluded resident aliens who had resided in the United States for fewer than fifteen years from receiving benefits; id.,

367; and the other statute barred aliens from receiving benefits regardless of the duration of their residency. Id., 368 and n.3. The court concluded that each statute drew a classification on the basis of alienage because citizens were able to participate in the programs on less restrictive terms than aliens merely because of their citizenship status. See id., 371. The court, relying on its previous cases, applied strict scrutiny and concluded that the states had not provided sufficient justification to withstand such scrutiny. Id., 376.

Since *Graham*, the United States Supreme Court has continued to find discrimination based on alienage in state programs that favor citizens over aliens on the basis of an individual's citizenship status. See, e.g., *Nyquist* v. *Mauclet*, 432 U.S. 1, 3–4, 12, 97 S. Ct. 2120, 53 L. Ed. 2d 63 (1977) (invalidating state statute providing assistance only to citizens or to those aliens who have applied for citizenship); see also *Plyler* v. *Doe*, 457 U.S. 202, 205, 230, 102 S. Ct. 2382, 72 L. Ed. 2d 786 (1982) (invalidating state statute barring *illegal* aliens from attending public schools that citizens and legal aliens were permitted to attend); cf. *Toll* v. *Moreno*, 458 U.S. 1, 17, 102 S. Ct. 2977, 73 L. Ed. 2d 563 (1982) (invalidating under supremacy clause state statute providing assistance to citizens and certain aliens but denying such assistance to other aliens); but cf. *Ambach* v. *Norwick*, 441 U.S. 68, 74–75, 80–81, 99 S. Ct. 1589, 60 L. Ed. 2d 49 (1979) (upholding state's exclusion of aliens from employment in "governmental function" positions [internal quotation marks omitted]).

This court likewise has invalidated a classification based on alienage similar to those invalidated by the United States Supreme Court. See *Barannikova* v. *Greenwich*, supra, 229 Conn. 690–91. In *Barannikova*, this court reviewed a challenge to a classification in an entirely state funded public assistance program for both citizens and aliens. See id., 673–74, 688. The program

at issue in *Barannikova* applied certain eligibility restrictions to aliens who were required to have sponsors when they were admitted into the United States, but those restrictions did not apply to citizens or to those aliens who were not required to have sponsors.[21] See id., 673–74. The program specifically required those aliens admitted to the United States on a promise of support from a sponsor to include proof of their sponsor's income with their application for public assistance. See id., 673. These requirements did not apply to citizens or to those aliens who were not required to have sponsorship agreements. See id., 673–74. The plaintiff, Nadejda Barannikova, a legal alien who had been admitted into the United States with the support of a sponsor, applied for public assistance but was denied benefits because she had failed to include information concerning her sponsor's income.[22] Id., 667–68. Barannikova claimed, inter alia, that the challenged requirement violated the equal protection clause of the federal constitution because it impermissibly discriminated on the basis of alienage. Id., 669–70. The defendant, the town of Greenwich (town), defended the requirement, partly on the ground that the requirement did not discriminate against aliens in favor of citizens but, instead, discriminated against one subclass of aliens in favor of another: sponsored aliens and non-sponsored aliens. See id., 687. The town argued that this distinction was relevant to the issue of need in the context of a means tested benefit program. See id. This court rejected the town's argument. Id., 688. Relying

[21] Because immigrants are not permitted to enter the United States if they are likely to become dependent on public assistance, the federal government requires those immigrants who do not have sufficient means to support themselves to provide proof of support from a sponsor before being admitted into the country. See *Barannikova* v. *Greenwich*, supra, 229 Conn. 673 n.17.

[22] After Barannikova was admitted to the country, she had a falling out with her sponsor, and her sponsor refused to provide any assistance to her. *Barannikova* v. *Greenwich*, supra, 229 Conn. 667–69.

on *Nyquist* v. *Mauclet*, supra, 432 U.S. 1, we concluded that the challenged scheme did discriminate on the basis of alienage, regardless of the relevance of the sponsorship requirement, because only aliens were harmed by the requirement, such requirement not having been imposed on similarly situated citizens who continued to benefit from the program on less restrictive terms. See *Barannikova* v. *Greenwich*, supra, 688.

Unlike the programs in *Barannikova* and the foregoing United States Supreme Court cases, which all provided assistance to citizens but denied assistance to certain groups of aliens or all aliens, SMANC is a state medical assistance program that provides assistance only to aliens who are barred by the federal government from participating in federal Medicaid. See General Statutes (Rev. to 2009) § 17b-257b. No citizens receive benefits under SMANC, and, indeed, that program never has provided assistance to citizens because citizens never were eligible for the program. Following the substantial elimination of SMANC by § 64 of Spec. Sess. P.A. 09-5, the only group continuing to receive assistance under the program are those aliens who applied for or were receiving nursing facility or home care as of the date that § 64 was enacted. See Spec. Sess. P.A. 09-5, § 64. Because the state is not providing a benefit to citizens through that program that it denies to some or all aliens, the state cannot be discriminating against aliens in favor of citizens.

Although it is true, as the plaintiff argues, that only aliens are harmed by the elimination of SMANC, this fact alone does not establish discrimination based on alienage. When a state establishes an assistance program that benefits only aliens, the elimination of that program does not violate the equal protection clause simply because the state is taking a benefit away from aliens. The relevant question in determining if state action discriminates on the basis of alienage is not

whether the state is taking action that harms only aliens but, rather, whether the state program provides a benefit to citizens that it does not provide to some or all aliens because of their status as noncitizens. See *Nyquist* v. *Mauclet*, supra, 432 U.S. 3–4, 12 (finding discrimination based on alienage in state program that provided benefit only to citizens and aliens who had applied for citizenship); *Graham* v. *Richardson*, supra, 403 U.S. 367–68, 376 (finding discrimination based on alienage in state programs that provided assistance to citizens but denied assistance to some or all aliens); *Barannikova* v. *Greenwich*, supra, 229 Conn. 673, 688 (finding discrimination based on alienage in state assistance program applying eligibility requirement to certain aliens but not to citizens or other aliens). Thus, in *Barannikova*, we concluded that the requirement at issue discriminated on the basis of alienage because it singled out a subclass of aliens for treatment that was different from that afforded to similarly situated citizens within a single program. See *Barannikova* v. *Greenwich*, supra, 688.[23] Because only aliens, and not citizens,

[23] Moreover, any argument that a state discriminates on the basis of alienage whenever state action harms only aliens essentially asks this court to read the equal protection clause to require unequal treatment in favor of certain classes of persons by virtue of their membership in a class alone, rather than ensuring equal treatment of similarly situated classes of individuals. Under such an argument, if any state establishes a program to benefit only aliens, any attempt to eliminate or reduce the benefit provided only to aliens under that program would be subject to strict scrutiny review simply because such action necessarily will harm only aliens, regardless of how aliens are treated as compared to citizens. To require strict scrutiny review for any reduction of a statutory benefit conferred on aliens alone simply because only aliens are harmed by the reduction would essentially equate that benefit with a fundamental constitutional right, the infringement of which would be subject to strict scrutiny review. See, e.g., *Shapiro* v. *Thompson*, 394 U.S. 618, 638, 89 S. Ct. 1322, 22 L. Ed. 2d 600 (1969) (invalidating statutes that infringed on fundamental right to travel within United States after applying strict scrutiny). This argument, then, is more akin to a due process argument, i.e., that once the state has provided assistance to a certain class, it is forever barred from eliminating or diminishing that assistance. We previously have rejected this argument. See *Moore* v. *Ganim*, 233 Conn. 557, 594, 660 A.2d 742 (1995) ("the fact that the benefit has been made

ever have benefited from SMANC, and because no citizens presently receive assistance under the program, the state is not providing a benefit to citizens that it is withholding from the class members and is not treating aliens disparately as compared to citizens. We therefore conclude that § 64 of Spec. Sess. P.A. 09-5 does not discriminate against aliens in favor of similarly situated citizens and, therefore, does not create a classification based on alienage.[24]

The plaintiff argues that the state is providing a benefit to citizens that it does not provide to certain aliens insofar as the state continues to participate in federal Medicaid, which provides assistance to citizens but not to the class members. The plaintiff claims that, as long as the state provides such assistance to citizens through federal Medicaid, the equal protection clause requires the state to provide an equivalent level of assistance, through a state program, to the class members. The state's failure to do so, according to the plaintiff, means that the state is treating the class members disparately solely on the basis of their status as noncitizens. We disagree for two reasons. First, we conclude that the plaintiff's argument improperly compares the treatment of the class members within a program funded and administered exclusively by the state to the treatment of citizens within a separate, federal-state cooperative program governed by federal law and funded in substantial part by the federal government. Second, even if

available for a length of time [does not itself] create an unqualified right to continue to receive such [a benefit]").

[24] Instead of discriminating between similarly situated aliens and citizens, the substantial elimination of SMANC appears to discriminate among different categories of similarly situated aliens because Spec. Sess. P.A. 09-5, § 64, continues coverage under SMANC for certain aliens but eliminates coverage for all other aliens formerly eligible for that program. This classification is based, however, on nonsuspect factors such as whether the individual had applied for or was receiving nursing facility or home care as of the date that Spec. Sess. P.A. 09-5, § 64, became effective.

we were to look to the federal Medicaid program to determine whether the state is providing a benefit to citizens that it denies to aliens, we nevertheless conclude that the state's participation in federal Medicaid does not discriminate against the class members on the basis of their status as noncitizens. We further discuss each of these conclusions in turn.

1

The plaintiff argues that the state's treatment of the class members within a program funded and administered exclusively by the state should be compared to the treatment of citizens within the separate, federal Medicaid program. We disagree.

The equal protection clause requires only that the state treat individuals in a manner similar to that which the state treats other similarly situated individuals. See, e.g., *Graham* v. *Richardson*, supra, 403 U.S. 371; *Barannikova* v. *Greenwich*, supra, 229 Conn. 675. Courts examining claims similar to those advanced in the present case have held that the equal protection clause does not require the state to treat individuals in a manner similar to how others are treated in a different program governed by a different government. See *Doe* v. *Commissioner of Transitional Assistance*, 437 Mass. 521, 528, 533–35, 773 N.E.2d 404 (2002) (treatment of individuals under separate, federal-state cooperative program not relevant to treatment of individuals within alien-only program); see also *Soskin* v. *Reinertson*, 353 F.3d 1242, 1255–56 (10th Cir. 2004) (treatment of individuals within alien-only Medicaid program incomparable to treatment of citizens under federal Medicaid); *Khrapunskiy* v. *Doar*, 12 N.Y.3d 478, 488–89, 909 N.E.2d 70, 881 N.Y.S.2d 377 (2009) (state not required to guarantee equal treatment under state program as that provided to citizens under federal program); but cf. *Ehrlich* v. *Perez*, 394 Md. 691, 731, 908 A.2d 1220 (2006) (invalidat-

ing state's decision to eliminate funding for program benefiting only aliens when neither party contested issue of whether decision discriminated on basis of alienage).

In *Doe* v. *Commissioner of Transitional Assistance*, supra, 437 Mass. 528, the Massachusetts Supreme Judicial Court concluded that Massachusetts, in imposing an eligibility limitation on aliens receiving assistance under an alien-only program administered exclusively by the state, did not discriminate against aliens in favor of citizens, who received similar assistance under a separate, federal-state cooperative benefit program that did not have such eligibility limitations. The plaintiffs, a group of aliens who were ineligible for the alien-only public assistance program administered exclusively by the state (alien-only program) because of a six month state residency requirement, claimed that that residency requirement violated the equal protection clause in that it discriminated between aliens and citizens insofar as citizens, who were covered under the separate, federal-state transitional aid to families with dependent children (TAFDC) program, were not subject to such residency requirements. Id., 522–24. Similar to the federal Medicaid program, the TAFDC program is governed by federal law and funded by the federal government and the state. Id., 522–23. The plaintiffs were ineligible for the TAFDC program, however, because of the five year rule in the Welfare Reform Act. See id., 522, 524. The alien-only program, which Massachusetts created to help cover those aliens displaced by the federal five year rule, imposed a six month state residency requirement on any participants, whereas the federal-state TAFDC program imposed no such residency requirement on citizens covered under that program. See id., 523. The plaintiffs argued that the application of a six month residency requirement to the plaintiffs while citizens continued to receive benefits through TAFDC with-

out such a restriction demonstrated that the state was discriminating against the plaintiffs on the basis of their alienage. See id., 532–33. The court rejected the plaintiffs' comparison to citizens covered under TAFDC and concluded that "[t]he fact that citizens are eligible to receive benefits from a different program (TAFDC) on conditions less restrictive than those imposed on [the plaintiffs] is a direct result of the enactment of uniform [f]ederal policies . . . and does not affect [the court's] analysis of the proper standard of review to be used in evaluating [the alien-only program]." Id., 533. The court, looking only at the treatment of individuals within the alien-only program, determined that the residency requirement discriminated only within the alien-only program between those aliens who had lived in the state for six months and those who had not, a classification that the court upheld. Id., 533–35.

The Tenth Circuit Court of Appeals expanded on this reasoning in *Soskin* v. *Reinertson*, supra, 353 F.3d 1242. In *Soskin*, the court held that a state's decision to treat aliens differently from citizens in the provision of optional federal Medicaid assistance did not discriminate against aliens in favor of citizens because, following the passage of the Welfare Reform Act, a state's different treatment of aliens within an alien-only program should not be compared to the treatment of citizens under federal Medicaid. See id., 1255–56. In *Soskin*, the court addressed a claim regarding Colorado's decision to eliminate certain optional assistance for qualified aliens under the federal Medicaid program while citizens continued to receive such assistance through federal Medicaid. See id., 1244, 1246. As a result of the Welfare Reform Act, federal Medicaid requires states to cover certain qualified aliens under federal Medicaid and allows states the option to extend coverage to certain other groups of qualified aliens. Id., 1245–46; see 42 U.S.C. § 1396a (a) (10) (A) (ii) (2006). Following the

passage of the Welfare Reform Act, Colorado initially opted to cover certain optional groups but, facing a budget shortfall, subsequently decided to eliminate this optional coverage. *Soskin* v. *Reinertson*, supra, 1246.

The plaintiffs in *Soskin*, all qualified aliens whose federal Medicaid coverage was eliminated in 2003, filed a class action, claiming that Colorado's decision to eliminate their coverage discriminated against aliens in favor of citizens who remained eligible for coverage under federal Medicaid. See id., 1247. The court rejected this claim. See id., 1255–56. The court concluded that the elimination of the optional coverage did not discriminate between aliens and citizens because, as a result of the Welfare Reform Act, coverage within the federal Medicaid program for aliens and citizens should be considered separately. See id. The court reasoned: "What Congress has done in the [Welfare Reform Act] is, in essence, create two welfare programs, one for citizens and one for aliens. Within the aliens-only program, states have the option of including more or fewer aliens. The decision to have separate programs for aliens and citizens is a Congressional choice, subject only to rational-basis review. See *Mathews* [v. *Diaz*, 426 U.S. 67, 96 S. Ct. 1883, 48 L. Ed. 2d 478 (1976)]. A state's exercise of the option to include fewer aliens in its aliens-only program, then, should not be treated as discrimination against aliens as compared to citizens. That aspect of the discrimination is [Congress'] doing— by creating one program for citizens and a separate one for aliens. Rather, what the state [of Colorado] is doing is discriminating within the aliens-only program against one class of aliens as compared to other classes of aliens. . . . This discrimination among subclassifications of aliens is not based on a suspect classification (such as alienage). The discrimination, rather, is based on nonsuspect classifications . . . ." (Citation omitted.) *Soskin* v. *Reinertson*, supra, 353 F.3d 1255–56. The

court thus applied the rational basis test to Colorado's nonsuspect classification, namely, the state's choice to cover certain groups of qualified aliens on the basis of their work history or military service, and concluded that the classification was constitutional. See id., 1256.

The only appellate decision of which we are aware that holds that a state may not reduce or eliminate state funded assistance to aliens in an alien-only program while continuing to cover citizens through a federal-state cooperative program is that of the Court of Appeals of Maryland in *Ehrlich* v. *Perez*, supra, 394 Md. 691. In *Ehrlich*, the court addressed a situation similar to that in the present case. Following Congress' adoption of the Welfare Reform Act, the state of Maryland elected to create a separate alien-only program (alien-only program) administered exclusively by the state to provide medical assistance to those aliens who became ineligible for federal Medicaid as a result of the federal five year rule. See id., 703. Facing budget constraints, however, Maryland eliminated the funding for the program, effectively eliminating the assistance previously afforded to the plaintiffs. See id., 704–705. The plaintiffs claimed that the state discriminated against them on the basis of alienage because citizens continued to receive coverage under federal Medicaid, in violation of the Maryland constitution. Id., 699. The defendants in *Ehrlich* did not contest the plaintiffs' claims on the issue of discrimination but, instead, focused exclusively on the appropriate level of judicial scrutiny. See id., 709–11. The court rejected the defendants' arguments for a deferential standard of review and, instead, applied strict scrutiny, holding that the state had not provided sufficient justification for eliminating the funding. See id., 730–33.

We find *Ehrlich* to be unpersuasive to our analysis on this issue because that case did not address the issue of discrimination. The defendants in that case did not

contest the plaintiffs' argument that eliminating the funding for the alien-only program discriminated on the basis of alienage. See id., 709–11. Thus, the court in *Ehrlich* did not have the benefit of any argument by the parties on the subject of discrimination or any reason or occasion to analyze this issue. Because this issue was not contested in the appeal before the court, the court did not provide any significant discussion or analysis as to whether the decision to eliminate funding for the alien-only program discriminated against aliens in favor of citizens who received coverage under federal Medicaid.[25] In the absence of any analysis on this issue, we

[25] Although the defendants in *Ehrlich* did not contest the issue of discrimination, and the court did not provide any significant analysis of this issue, it nevertheless appears that the court did at least briefly mention some basic principles governing alienage classifications. The court's discussion of these principles was limited to the following: "Statutory discrimination within the larger class of legal resident aliens, providing benefits to some aliens, but not to others, is nonetheless a classification based on alienage." *Ehrlich* v. *Perez*, supra, 394 Md. 719. In support of this statement, the court cited to the decisions of the United States Supreme Court in *Nyquist* v. *Mauclet*, supra, 432 U.S. 7–9, and *Graham* v. *Richardson*, supra, 403 U.S. 371, 376. Additionally, while analyzing the issue of the appropriate level of scrutiny to apply to the challenged classification, the court in *Ehrlich* apparently rejected the conclusion reached by the courts in *Doe* and *Soskin* that discrimination within an alien-only program is not discrimination against aliens. See *Ehrlich* v. *Perez*, supra, 719–20 n.12. In rejecting the holdings of *Doe* and *Soskin*, the court in *Ehrlich* simply repeated the holdings of those cases and stated: "Rather, *Graham* and *Nyquist* make clear that discrimination among sub-classes of resident aliens remains a suspect classification and thus a [s]tate's discriminatory action will be subjected to strict judicial scrutiny review." Id., 720 n.12. We disagree with these brief statements by the court in *Ehrlich* for two reasons.

First, to the extent that this statement implies that state classifications that harm a subclass of aliens necessarily discriminate on the basis of alienage, we reject this conclusion for the same reasons that we enumerated in footnote 23 of this opinion. As we previously stated, a state discriminates on the basis of alienage when it favors citizens over aliens because of citizenship status and not merely because the state takes an action that harms a group of aliens within a program that benefits only aliens.

Second, we further disagree with the court's reading of *Nyquist* and *Graham*. Although the court in *Ehrlich* appears to read these cases to mean that discriminating between groups of aliens is necessarily a classification based on alienage, this reading is not supported by those cases. *Nyquist*

do not find *Ehrlich* persuasive. See, e.g., *Kerrigan* v. *Commissioner of Public Health,* supra, 289 Conn. 228–30 (finding unpersuasive and declining to follow cases that did not actually address or analyze issue before court).[26]

and *Graham* addressed claims of discrimination in programs that generally provided benefits to both citizens and aliens but that denied benefits to certain aliens on the basis of their status as noncitizens. See *Nyquist* v. *Mauclet,* supra, 432 U.S. 3–4, 8–9 (state benefit provided to citizens and aliens who had applied for citizenship but denied to those aliens who had not applied for citizenship); *Graham* v. *Richardson,* supra, 403 U.S. 376 (invalidating state law that provided benefits to citizens and some aliens but denied benefits to other aliens). In those cases, the court concluded that the state had classified on the basis of alienage in denying benefits to certain aliens because the challenged statutes "imposed a . . . requirement for welfare benefits on aliens but not on citizens." *Nyquist* v. *Mauclet,* supra, 8; see also *Graham* v. *Richardson,* supra, 376. Unlike the programs at issue in *Nyquist* and *Graham,* however, the program that we address in the present case, like that in *Ehrlich,* provides benefits to aliens only and not to citizens because citizens cannot participate. Therefore, the state, in reducing the scope of SMANC, an alien-only program, is not imposing any restrictions on aliens that it is not imposing on citizens. Moreover, unlike in *Nyquist* and *Graham,* in the present case, the state is not providing any benefit to citizens through a program administered and funded exclusively by the state that it is denying to certain aliens. Because *Nyquist* and *Graham* did not address discrimination between aliens in a program that serves only aliens, these cases do not affect our analysis of the programs at issue in the present case. To the extent that the court in *Ehrlich* determined otherwise, we disagree.

[26] After oral argument, the plaintiff's counsel notified this court of a decision from the United States District Court for the Western District of Washington, in which the court granted a preliminary injunction precluding the state of Washington from eliminating an alien-only assistance program. *Pimentel* v. *Dreyfus,* United States District Court, Docket No. C11-119 MJP (W.D. Wash. February 17, 2011). In granting the preliminary injunction, the court, without providing any significant analysis or authority, concluded that the state was discriminating against aliens because citizens continued to receive assistance under a federal program while aliens no longer would receive similar assistance under a program administered and funded exclusively by the state of Washington. In view of the lack of full analysis of the issue of discrimination in the court's opinion, and the fact that the court was ruling only on a motion for a preliminary injunction pending trial, we find this decision unpersuasive to our analysis in the present case. Furthermore, we respectfully disagree with the court's reasoning. To the extent that the court concluded that the state must fill the void left by the

We agree with the holdings of *Doe* and *Soskin*, which demonstrate that a state does not discriminate against aliens when it treats aliens covered under an alien-only benefit program differently from the way in which citizens and other aliens are treated under separate, federal-state benefit programs. Unlike SMANC, which is governed and funded entirely by the state, the federal Medicaid program is a separate, cooperative federal-state medical assistance program governed by federal law and funded in substantial part by the federal government. Although each state chooses to participate in and administers its own federal Medicaid program, the state's participation in federal Medicaid is subject to approval by the federal government, and federal reimbursement is contingent on the state's continued compliance with federal Medicaid law and regulations. See generally 42 U.S.C. §§ 1396a through 1396c (2006 and Sup. III 2009). Federal law governs or guides almost every aspect of the program, including the program

federal government by providing assistance that the federal government denies to aliens, we disagree for the reasons set forth in this opinion and the decisions of courts addressing that same issue. See, e.g., *Soskin* v. *Reinertson*, supra, 353 F.3d 1255–56 (upholding elimination of alien-only assistance program); see also *Khrapunskiy* v. *Doar*, supra, 12 N.Y.3d 489 (concluding that equal protection clause does not require states to "remediate" effects of Welfare Reform Act).

We further disagree with the District Court's conclusion insofar as it rejects the holding in *Soskin* that the elimination of an alien-only program does not discriminate on the basis of alienage. In rejecting the holding of *Soskin*, the District Court relied exclusively on a single sentence in *Nyquist* v. *Mauclet*, supra, 432 U.S. 7–9, in which the United States Supreme Court stated that "the important points are that [the challenged statute] is directed at aliens and that only aliens are harmed by it." Id., 9. We respectfully disagree with the District Court's reliance on *Nyquist* for the same reasons that we disagree with the apparent reliance by the court in *Ehrlich* on that case insofar as those courts apply language in *Nyquist* in a manner that goes beyond the factual circumstances addressed in *Nyquist*. *Nyquist* does not affect our analysis in the present case, and we disagree with the District Court's reliance on a single sentence in that decision to reach a contrary conclusion.

eligibility and coverage requirements, and the manner in which the state administers the program.[27]

Moreover, the substantial federal reimbursement component of federal Medicaid provides an essential level of funding with which the state may provide medical assistance to a significant portion of its indigent population. In Connecticut, federal Medicaid is the largest publicly funded medical assistance program available. According to figures cited by the plaintiff, coverage and administration of the federal Medicaid program in the 2008–2009 fiscal year cost the state approximately $3.8 billion,[28] at least one half of which is reimbursable by the federal government. This means that, through the federal Medicaid program, the state receives at least $1.9 billion in federal funding to provide publicly funded medical assistance in accordance with federal law. We are unaware of any other publicly funded medical assistance program available to the

---

[27] Federal law provides for comprehensive guidelines and requirements regarding the state's plan, including requirements that the state plan (1) outline the state's financial participation, subject to certain minimum levels of federally mandated funding; see 42 U.S.C. § 1396a (a) (2) (2006); (2) provide for a hearing for any applicant who is denied coverage; 42 U.S.C. § 1396a (a) (3) (2006); (3) establish personnel guidelines utilizing a merit based system; 42 U.S.C. § 1396a (a) (4) (A) (2006); (4) provide for "training and effective use of paid subprofessional staff"; 42 U.S.C. § 1396a (a) (4) (B) (2006); (5) provide for reporting as required by the federal government; 42 U.S.C. § 1396a (a) (6) (2006); and (6) safeguard the use or disclosure of information concerning applicants and recipients. 42 U.S.C. § 1396a (a) (7) (2006). Additionally, federal law sets requirements regarding the categories of individuals for which the state must provide care; 42 U.S.C. § 1396a (a) (10) (2006 and Sup. III 2009); and further establishes requirements regarding the types of medical services that the state must cover under federal Medicaid. 42 U.S.C. § 1396d (a) (2006). Federal law also sets forth specific levels of federal reimbursement depending on a number of factors established by federal law. See 42 U.S.C. § 1396b (2006 and Sup. III 2009).

[28] Office of Policy and Management, "Connecticut: FY2010–2011 Governor's Midterm Budget Adjustments" (February 3, 2010) p. B-93, available at http://www.ct.gov/opm/lib/opm/budget/2010_2011_midterm_budget/budget-documents/201011govmidtermadjustmentsentirebook.pdf (last visited March 17, 2011).

state that offers such a substantial reimbursement for state expenditures. We doubt that, in the absence of reimbursement by the federal government through federal Medicaid, the state alone could provide an equivalent level of care to its residents.

In light of the scope of federal control over the federal Medicaid program and the extent to which the federal government funds that program, we agree with the conclusions of other courts that have addressed similar comparisons and conclude that, at least for purposes of an equal protection analysis, the state's treatment of individuals within SMANC cannot be compared to the state's treatment of individuals within the separate federal Medicaid program, which is governed and funded substantially by a different government.[29]

The cases on which the plaintiff relies in support of her claim that the substantial elimination of SMANC discriminates on the basis of alienage involve different factual predicates and are inapplicable to the issue presented. As we subsequently will discuss more fully in this opinion, the cases that the plaintiff cites, like *Graham*, involve claims of discrimination against aliens in favor of citizens within a single, state funded and state controlled program that provides assistance to aliens and citizens alike and do not involve claims based on how citizens are treated under a different program.

The plaintiff first argues that this court's decision in *Barannikova* v. *Greenwich*, supra, 229 Conn. 664, directly controls our analysis in the present case. We disagree. As we previously discussed, *Barannikova* did not involve a classification like the classification at

<hr>

[29] Even though state law previously had required the defendant to administer SMANC to provide assistance "to the same extent as" that provided under federal Medicaid; General Statutes (Rev. to 2009) § 17b-257b; this does not change the fact that a different government ultimately governs and provides an essential level of funding for the federal Medicaid program.

issue in the present case, and, therefore, it does not impact our resolution of the issues presented by this appeal.

Other authorities on which the plaintiff relies are unhelpful to our analysis. See *Aliessa* v. *Novello*, 96 N.Y.2d 418, 754 N.E.2d 1085, 730 N.Y.S.2d 1 (2001); *Korab* v. *Koller*, United States District Court, Docket No. 10-00483 JMS/KSC (D. Haw. November 10, 2010). The plaintiff's reliance on these cases is misplaced because, like *Barannikova*, they involved claims by aliens who were treated differently from similarly situated citizens under a single program administered and funded exclusively by a state that provided assistance to both aliens and citizens alike; those cases simply do not involve claims of discrimination in the treatment of aliens as compared to citizens covered under a federal-state cooperative program.

In *Aliessa*, the New York Court of Appeals addressed a challenge to New York's exclusion of a class of aliens from a medical assistance program, funded exclusively by the state, that provided assistance to citizens and certain aliens but not to the plaintiffs, all of whom were aliens excluded from participating in the program. See *Aliessa* v. *Novello*, supra, 96 N.Y.2d 422, 427. The plaintiffs claimed, inter alia, that the state's decision to exclude them from the state funded program violated the equal protection clause because the state was providing assistance to similarly situated citizens through that program but not to the plaintiffs. See id., 427, 430. The court concluded, inter alia, that the statute at issue discriminated against aliens and that the classification violated the equal protection clause of the fourteenth amendment. Id., 435–36. Thus, *Aliessa* involved a claim of discrimination within a wholly state funded and state controlled public assistance program and did not involve a comparison of the treatment of aliens under

one program to the treatment of citizens under a separate federal-state program.

Indeed, the New York Court of Appeals itself emphasized the distinction between these two situations in a subsequent decision. See *Khrapunskiy* v. *Doar*, supra, 12 N.Y.3d 478. In *Khrapunskiy*, the court addressed a claim similar to that made by the plaintiff in the present case and reached a conclusion consistent with that which we reach. *Khrapunskiy* involved a claim by the plaintiffs, all of whom were legal aliens barred from participating in the federal Supplemental Security Income (SSI) program, which provided cash payments to certain categories of needy individuals along with additional payments funded by the state of New York (ASP). Id., 482–83. The plaintiffs were barred from receiving benefits under the SSI program by virtue of the five year rule established by the Welfare Reform Act and were barred from receiving benefits under the ASP program by virtue of state law because of their ineligibility under the SSI program. Id. As a result of their ineligibility for SSI and ASP (collectively SSI/ASP), the plaintiffs instead received benefits under a " 'safety net assistance' " program, administered exclusively by the state, that provided cash payments to the plaintiffs at a significantly lower rate than that provided to citizens under SSI/ASP. Id., 483. The plaintiffs claimed that the purported classification violated the equal protection clauses of the federal and New York constitutions because the statute at issue discriminated against the plaintiffs in favor of similarly situated citizens who continued to receive a higher level of assistance through the federal-state SSI/ASP program. See id., 483–84. The plaintiffs further argued that, to remedy the violation, the state must provide a level of assistance equivalent to that received by citizens under SSI/ASP. See id., 484. The court rejected the plaintiffs' arguments and concluded that, following the passage of the Welfare

Reform Act, the state was under no obligation to provide, under the state funded program, the same level of coverage that citizens received under the federal-state program. Id., 488–89. In reaching its decision, the court first determined that *Aliessa* did not apply because that case "involved a state-funded program"; id., 488; whereas *Khrapunskiy* involved a comparison between the treatment of certain aliens under a state funded program and the treatment of citizens under a separate federal-state program.[30] Id., 489. The court, instead, looked at whether the state was providing coverage to similarly situated citizens within a plan administered and funded only by the state. See id., 488–89. Because no such plan existed, the court concluded that the state was not discriminating against aliens in favor of citizens. See id. In rejecting the plaintiffs' claims, the court concluded that "the right to equal protection does not require [a] [s]tate to create a new public assistance program in order to guarantee equal outcomes under wholly separate and distinct public benefit programs. Nor does it require [a] [s]tate to remediate the effects of [the federal Welfare Reform Act]." Id., 489.

The decision by the United States District Court for the District of Hawaii in *Korab* v. *Koller*, supra, United States District Court, Docket No. 10-00483 JMS/KSC, is similarly inapposite. In *Korab*, the court addressed a Hawaii law that rendered the plaintiffs, who all were aliens in need of public medical assistance, ineligible for certain state funded medical programs (old programs) that formerly had provided assistance to both aliens and citizens. That law placed the plaintiffs in a

---

[30] The Massachusetts Supreme Judicial Court also distinguished the program at issue in *Aliessa* from a program identical in all material respects to the one at issue in the present case for the same reasons on which the court in *Khrapunskiy* relied. See *Doe* v. *Commissioner of Transitional Assistance*, supra, 437 Mass. 531 (distinguishing *Aliessa* because that case addressed "[a] [s]tate-funded benefit program available to citizens but not available to aliens on the same terms").

different state funded program that provided less assistance than citizens continued to receive under the state's old programs. The plaintiffs claimed that the state's decision to reduce the assistance that the state formerly had provided to the plaintiffs violated the equal protection clause of the fourteenth amendment because the state continued to provide greater assistance to citizens under the old programs. The court, in a ruling on a motion to dismiss filed by the director of the Hawaii department of human services, agreed with the plaintiffs and concluded that the state had discriminated between aliens and citizens by rendering them ineligible to receive benefits from state programs that continued to provide greater assistance to citizens. For these reasons, the court held that the plaintiffs' complaint set forth a sufficient legal claim, and the court denied the motion to dismiss. Thus, unlike the present case, *Korab* involved discrimination within medical assistance programs that were funded and administered exclusively by the state and did not involve a claim that the state was treating aliens differently than citizens who received assistance under federal Medicaid. Consequently, *Korab*, like the other authorities on which the plaintiff relies, does not impact our analysis or conclusions with respect to this issue.

Consistent with those decisions that actually have addressed the issue of discrimination in circumstances similar to those in the present case, we conclude that the trial court improperly compared the treatment of the class members under § 64 of Spec. Sess. P.A. 09-5 to the treatment of citizens under the wholly separate federal Medicaid program.[31]

---

[31] The present case does not involve a situation in which the state reduces or eliminates a benefit provided to aliens while continuing to provide such a benefit to citizens through programs administered and funded exclusively by the state, and, consequently, we do not address the validity of such a scheme. We do note, however, that, in such a situation, our decision in *Barannikova* v. *Greenwich*, supra, 229 Conn. 664, and the decisions in similar cases on which the plaintiff relies; *Graham* v. *Richardson*, supra,

2

Even if we were to compare the treatment of the class members under Spec. Sess. P.A. 09-5, § 64, to that of citizens under the federal Medicaid program, we nevertheless conclude that the state's participation in federal Medicaid, although not providing an equivalent benefit to the class members, does not discriminate on the basis of alienage.

The plaintiff argues that, notwithstanding the difference between the two programs, the state is discriminating against the class members insofar as it chooses to participate in federal Medicaid and to spend approximately $1.9 billion of its own money for medical assistance to citizens eligible for Medicaid while no longer providing any funds for medical assistance to the class members following the substantial elimination of SMANC. The plaintiff argues that, because the substantial elimination of SMANC harmed certain aliens by eliminating their publicly funded medical assistance while citizens continue to receive such assistance under federal Medicaid, the state's continued participation in federal Medicaid discriminates against the class members on the basis of alienage. Essentially, the plaintiff argues that, when the federal government rendered the class members ineligible for federal Medicaid through the passage of the Welfare Reform Act, the equal protection clause required, and still requires, the state to provide a level of assistance to the class members that is equivalent to the level of assistance that citizens continue to receive under federal Medicaid. The plaintiff thus contends that the state must remediate the effects of the federal five year rule by filling the void in coverage created by the federal government and guaranteeing

---

403 U.S. 365; *Korab* v. *Kholler*, supra, United States District Court, Docket No. 10-00483 JMS/KSC; *Aliessa* v. *Novello*, supra, 96 N.Y.2d 418; would likely be relevant to a court's analysis of the constitutional implications of such a situation.

public medical assistance for the class members, through state funds alone, at a level equal to that provided to citizens and other aliens under the federal Medicaid program.[32] We disagree.

We conclude that the state's decision to participate in federal Medicaid does not draw a classification based on alienage but, instead, draws a classification based on an individual's eligibility for federal Medicaid. This classification is not based on any suspect classification such as alienage because it applies to both aliens and

[32] We note that there has been some confusion between the parties as to the exact nature of the plaintiff's equal protection challenge. In her complaint, the plaintiff claimed that §§ 55 and 64 of Spec. Sess. P.A. 09-5 violate the equal protection clause of the fourteenth amendment because they deprive the class members of publicly funded medical assistance while citizens continue to receive such assistance under federal Medicaid. For this reason, the plaintiff argued that the state may not eliminate SMANC insofar as it will result in a situation in which the state treats the class members differently from the way that citizens are treated under federal Medicaid.

The defendant apparently understood the plaintiff's challenge to be based on a different theory. In his brief, the defendant noted that the "[p]laintiff also does not claim that Connecticut was under any constitutional obligation to step forward and fill the gap deliberately left by Congress, but claims instead that having voluntarily stepped forward and having established a special alien-only benefit program only for those qualified aliens made ineligible by [the Welfare Reform Act], Connecticut is forever constitutionally barred from subsequently eliminating or curtailing the program."

In her brief, the plaintiff did not specifically respond to this statement by the defendant but, instead, repeated her claims that "Spec. Sess. P.A. 09-5 . . . violates the guarantees of the federal equal protection clause by utilizing alienage, a suspect classification subject to strict scrutiny, to eliminate . . . medical assistance benefits under the SMANC program, and bar [the class members] from accessing the SAGA-medical program, while similarly situated citizens continue to receive undiminished medical benefits [under federal Medicaid]."

At oral argument before this court, the plaintiff's appellate counsel acknowledged, however, that the nature of the plaintiff's challenge is based on the premise that, following the passage of the federal Welfare Reform Act, the equal protection clause required the state to fill the gap left by the federal government by providing to the class members a level of assistance equivalent to that received by citizens under federal Medicaid. In light of this clarification by the plaintiff's appellate counsel, we view this as the correct understanding of the plaintiff's equal protection challenge.

citizens alike, according to the eligibility requirements established by the federal, rather than state, government. When the state participates in federal Medicaid, it chooses to provide some state funding to assist those individuals who are eligible for the program and not to provide funding to those individuals who are ineligible for the program. The class members are not the only group of individuals ineligible for federal Medicaid. Indeed, citizens and other aliens are ineligible for federal Medicaid for a variety of reasons, including their income and asset levels, medical needs, categorical eligibility status, and inability to provide proper documentation. See generally 42 U.S.C. § 1396a (2006 and Sup. III 2009). Thus, when the state chooses to participate in federal Medicaid, it does not necessarily choose to deny coverage to any particular groups of individuals on the basis of a suspect classification; instead, the state's decision is based on the fact that these groups, among others, are ineligible for federal Medicaid, in accordance with federal law.

To be sure, the reason why the federal government excluded the class members from federal Medicaid is on account of their status as noncitizens. This, however, is not a result of any state action. Instead, it results from the federal government's decision to exclude them from federal Medicaid through the enactment of the federal five year rule in the Welfare Reform Act, which was enacted pursuant to Congress' broad authority over naturalization and immigration. See *Mathews* v. *Diaz*, supra, 426 U.S. 79–80.

In *Mathews*, the United States Supreme Court addressed an equal protection challenge[33] to the validity

---

[33] Because the equal protection clause of the fourteenth amendment applies only to the states, the plaintiffs in *Mathews* based their challenge on the equal protection principles that the United States Supreme Court has applied to the federal government through the due process clause of the fifth amendment to the United States constitution. See, e.g., *Buckley* v. *Valeo*, 424 U.S. 1, 93, 96 S. Ct. 612, 46 L. Ed. 2d 659 (1976).

of a federal law that barred permanent resident aliens who had lived in the United States for fewer than five years from participating in the federal Medicare supplemental medical insurance program (Medicare). Id., 69–70. The plaintiffs, who were aliens barred from participating in Medicare, argued that the federal law unconstitutionally discriminated against aliens in favor of citizens. See id., 70. The court rejected the plaintiffs' claims, concluding that the constitution vested Congress with "broad power over naturalization and immigration"; id., 79–80; and explained that any federal policy directed toward aliens "is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government" such that these matters are "largely immune from judicial inquiry or interference." (Internal quotation marks omitted.) Id., 81 n.17. Relying on these principles, the court concluded that "the fact that Congress has provided some welfare benefits for citizens does not require it to provide like benefits for all aliens." Id., 80. The court ultimately concluded that the five year rule at issue was a reasonable exercise of federal power. Id., 82–84. Relying on the rationale of *Mathews*, courts reviewing the constitutionality of the restrictions on alien eligibility imposed by the Welfare Reform Act consistently have upheld their validity. See, e.g., *Chicago* v. *Shalala*, 189 F.3d 598, 609 (7th Cir. 1999) (upholding exclusion of certain nonqualified aliens from federal assistance programs), cert. denied, 529 U.S. 1036, 120 S. Ct. 1530, 146 L. Ed. 2d 345 (2000); *Rodriguez ex rel. Rodriguez* v. *United States*, 169 F.3d 1342, 1350–53 (11th Cir. 1999) (same).

Thus, through the Welfare Reform Act, Congress, in a valid exercise of its plenary authority over immigration, has reduced the availability of federal-state public assistance programs to certain classes of aliens in order to

promote self-sufficiency by immigrants and reduce the burdens that the provision of these programs has placed on federal, state and local governments.[34] It is this lawful action by the federal government, and not any action by the state, that has resulted in the class members'

[34] The plaintiff's claim that the state is required to fill the void left in the wake of the passage of the Welfare Reform Act also contradicts Congress' stated intent in enacting that law in two ways. First, the plaintiff's interpretation of the Welfare Reform Act would render that act as nothing more than a cost-shifting plan rather than a plan to reduce the cost of publicly funded assistance to certain groups of aliens. The plaintiff's claims of discrimination rest on the argument that, notwithstanding the Welfare Reform Act, the state must provide the class members with a level of assistance that is equivalent to that received by citizens under federal Medicaid. Implicit in this argument is the contention that the purpose of the Welfare Reform Act was not to reduce the overall cost of publicly funded assistance to aliens but, instead, to shift the cost of coverage of this group away from the federal government and to the individual states. But to read the Welfare Reform Act as nothing more than a measure shifting the cost of coverage to the states would run contrary to national immigration policy and Congress' stated intent to reduce the states' burden of providing public assistance to certain groups of aliens by restricting the availability of assistance within those groups. In the Welfare Reform Act, Congress made clear its concern that, "[d]espite the principle of self-sufficiency, aliens have been applying for and receiving public benefits from Federal, State, and local governments at increasing rates"; 8 U.S.C. § 1601 (3) (2006); and that it intended to alter current alien eligibility rules because "[c]urrent eligibility rules for public assistance and unenforceable financial support agreements have proved wholly incapable of assuring that individual aliens not burden the public benefits system." 8 U.S.C. § 1601 (4) (2006).

Second, the plaintiff's argument would contradict Congress' stated intent to reduce the eligibility of certain aliens to receive public assistance in order to avoid providing an incentive for immigration by individuals who will depend on public assistance rather than remaining self-sufficient. Under the plaintiff's interpretation, the states would be required to provide those aliens displaced by the Welfare Reform Act a level of assistance equivalent to that which citizens receive under federal Medicaid. The plaintiff's argument would not reduce the eligibility of such aliens to receive public assistance but would only shift the provision of such assistance from the federal Medicaid program to the states alone. Congress explicitly stated, however, that it adopted the Welfare Reform Act "to enact new rules for eligibility and sponsorship agreements in order to assure that aliens be self-reliant in accordance with national immigration policy"; 8 U.S.C. § 1601 (5) (2006); such that "aliens within the Nation's borders not depend on public resources to meet their needs, but rather rely on their own capabilities and the

ineligibility to receive assistance under the federal Medicaid program. The state's participation in federal Medicaid, then, should not be viewed as discrimination by the state between aliens and citizens. The state has no control over the fact that the class members no longer are eligible to participate in federal Medicaid. In the eyes of the state, the class members simply comprise a group of individuals who, like many other groups of aliens and citizens alike, are ineligible for federal Medicaid. Thus, we reject the plaintiff's argument that the state is discriminating against the class members on the basis of alienage by continuing to participate in federal Medicaid while not providing similar assistance to the class members.

Insofar as the state's participation in federal Medicaid draws a classification on the basis of an individual's eligibility for federal Medicaid, as determined by the federal government, this classification is not based on alienage or any other suspect factors. The plaintiff has not claimed that this classification is irrational or without a legitimate purpose. We therefore conclude that this classification does not violate the equal protection clause of the fourteenth amendment.

If the state's decision to cover only those eligible for federal Medicaid does not violate the equal protection clause, then the equal protection clause does not require the state to enact separate, state-only programs to provide an equivalent level of assistance to those who are ineligible for federal Medicaid as federal Medicaid provides to those individuals who are eligible for that program. For this reason, the equal protection clause did not, and still does not, require the state to enact the SMANC program or an equivalent program to fill the void created by the federal government. If the equal

resources of their families, their sponsors, and private organizations . . . ." 8 U.S.C. § 1601 (2) (A) (2006).

protection clause did not require the state to enact SMANC, then the state's decision to eliminate that program or to reduce its scope does not violate the constitutional rights of those formerly eligible for assistance under the program because the provision of public assistance does not establish a right to continue receiving assistance. See, e.g., *Moore* v. *Ganim*, 233 Conn. 557, 594, 660 A.2d 742 (1995) ("the fact that the benefit has been made available for a length of time [does not, itself] create an unqualified right to continue to receive such benefits"). We therefore conclude that the equal protection clause imposed no obligation on the state to enact SMANC and that the subsequent curtailment of that program by virtue of the passage of § 64 of Spec. Sess. P.A. 09-5 does not violate the equal protection clause.[35]

Courts that have addressed similar claims similarly have concluded that the equal protection clause does not require the state to provide assistance to aliens displaced by the federal Welfare Reform Act. See *Khrapunskiy* v. *Doar*, supra, 12 N.Y.3d 489 ("[T]he right to equal protection does not require the [s]tate to create a new public assistance program in order to guarantee equal outcomes under wholly separate and distinct public benefit programs. Nor does it require the [s]tate to remediate the effects of [the federal Welfare Reform Act]."); see also *Soskin* v. *Reinertson*, supra, 353 F.3d 1255–56 ("A state's exercise of the option to include fewer aliens in its aliens-only program . . . should not be treated as discrimination against aliens as compared to citizens. That aspect of the discrimination is [Congress'] doing . . . . Rather, what the state is doing is

[35] Because the state voluntarily opted to create SMANC to benefit aliens displaced from federal Medicaid, the fact that the state has decided to curtail this program due to budgetary concerns should not be interpreted as a sign of invidiousness or animus toward the class members specifically or aliens generally.

discriminating within the aliens-only program against one class of aliens as compared to other classes of aliens. . . . This discrimination among subclassifications of aliens is not based on a suspect classification . . . ." [Citation omitted.]); *Doe* v. *Commissioner of Transitional Assistance*, supra, 437 Mass. 533 ("We . . . reject the . . . position that the strict scrutiny analysis [that] the [United State Supreme] Court applied to a classification based on alienage in *Graham* . . . should be applied to the unique circumstances of [the] case . . . . The fact that citizens are eligible to receive benefits from a different program . . . on conditions less restrictive than those imposed on qualified aliens is a direct result of the enactment of uniform [f]ederal policies, subject . . . to a separate rational basis review, and does not affect [the court's] analysis of the proper standard of review to be used in evaluating the [alien-only] program . . . ."); but cf. *Ehrlich* v. *Perez*, supra, 394 Md. 731 (invalidating state decision to reduce funding for alien-only program when issue of discrimination was not contested).

For the foregoing reasons, we conclude that the plaintiff has not met her burden of establishing that the state is discriminating against aliens in favor of similarly situated citizens. The plaintiff has advanced no other theory of discrimination based on suspect classifications. As such, any discrimination against the class members as a result of the substantial elimination of SMANC would fall along nonsuspect lines. The plaintiff has not claimed that the classifications arising from the passage of Spec. Sess. P.A. 09-5, § 64, are irrational. Therefore, we conclude that the state's enactment of Spec. Sess. P.A. 09-5, § 64, does not violate the equal protection clause of the federal constitution.

B

Challenge to Spec. Sess. P.A. 09-5, § 55

The defendant claims that the trial court incorrectly concluded that Spec. Sess. P.A. 09-5, § 55, which altered the statutory eligibility guidelines for SAGA-medical, creates a classification based on alienage because the eligibility criteria as amended by § 55 apply equally to aliens and citizens alike. The plaintiff responds that the trial court correctly concluded that § 55 discriminates on the basis of alienage because citizens who are ineligible for federal Medicaid receive coverage under SAGA-medical whereas the class members do not. We agree with the defendant.

We conclude that Spec. Sess. P.A. 09-5, § 55, does not classify on the basis of alienage but, instead, classifies on the basis of an individual's categorical eligibility for federal Medicaid. The eligibility requirement for SAGA-medical, as amended by § 55, provides in relevant part: "The Commissioner of Social Services shall implement a state medical assistance component of the state-administered general assistance program *for persons who do not meet the categorical eligibility criteria for Medicaid* on the basis of age, blindness, disability, pregnancy, being a parent or other caretaker relative of a dependent child, being a child under the age of twenty-one, or having been screened for . . . and . . . found to need treatment for either breast or cervical cancer. . . ." (Emphasis added.) General Statutes § 17b-192 (a). This language demonstrates that the classification for SAGA-medical eligibility is based on an individual's categorical eligibility for federal Medicaid such that those who meet the categorical eligibility requirements for federal Medicaid—those who are blind, disabled, pregnant, a parent of a dependent child, under the age of twenty-one, or sixty-five years of age or older—are excluded from SAGA-medical, and those

who do not meet the categorical eligibility requirements for federal Medicaid—i.e., those who, between the ages of twenty-one and sixty-four, are not a parent of a dependent child, blind, disabled or pregnant—are eligible for SAGA-medical. This provision draws absolutely no classifications on the basis of a person's citizenship status but, rather, applies to both aliens and citizens alike.[36] The reason that the class members are not eligible to participate in SAGA-medical is that they are categorically eligible for federal Medicaid and not that they are aliens. In fact, the parties have stipulated that aliens who have lived in the United States for fewer than five years and who do not meet the categorical eligibility requirements for federal Medicaid are not excluded from SAGA-medical. Indeed, the trial court recognized this in its memorandum of decision when it found that "[e]ligibility for SAGA-medical is not conditioned on citizenship or a specified period of residency in the United States."

Despite this recognition by the trial court, it nevertheless concluded that § 55 of Spec. Sess. P.A. 09-5 draws a classification on the basis of alienage because "[§§] 55 and 64, in combination, have created a situation [in which] low-income citizens who are ineligible for federal Medicaid are still eligible for SAGA-medical, but the members of the . . . class, who differ only because they are aliens, are not. . . . [I]t is clear that the result is to deprive the [class members] of all nonemergency health care solely because they are aliens." We disagree.

First, we disagree with the trial court's characterization of the nature of the eligibility requirements for

---

[36] Although it is true that most low income citizens who are excluded from SAGA-medical are nevertheless able to participate in federal Medicaid, whereas the class members are not, we already have determined that this is a result of the federal five year rule and not any state action, and that the state is not required to remediate the effects of the federal five year rule. See part II A 2 of this opinion.

SAGA-medical. The SAGA-medical program does not provide coverage to all low-income citizens who are ineligible to participate in federal Medicaid.[37] As we previously discussed, eligibility for SAGA-medical is based on whether an individual meets the categorical eligibility requirements for federal Medicaid and not on an individual's actual eligibility to participate in federal Medicaid. This classification applies equally to all citizens and all aliens, and does not distinguish between the two.

Second, to the extent that the trial court concluded that the state must provide assistance to the class members under SAGA-medical because they are ineligible for federal Medicaid, we disagree with this conclusion for the same reasons that the state is not obligated to provide assistance under SMANC for those aliens who are not eligible for federal Medicaid. See part II A of this opinion. The state has no affirmative obligation under the equal protection clause to provide the class members, through a state only program, the same assistance that citizens receive under a separate federal-state cooperative program. Insofar as the trial court determined otherwise, we conclude that it did so improperly.

Instead of drawing a classification on the basis of alienage, § 55 of Spec. Sess. P.A. 09-5 draws a classification on the basis of an individual's blindness, disability, pregnancy, or status of being a parent of a dependent child, or under the age of twenty-one or sixty-five years of age or older. As none of these classifications is a suspect classification, and the plaintiff has not claimed that any of these classifications lack a rational basis,

---

[37] For example, SAGA-medical does not provide coverage to those citizens who are categorically eligible for federal Medicaid but are nevertheless barred from participating in federal Medicaid because of an inability to produce proper documentation for eligibility, such as documents proving identity and citizenship.

we conclude that Spec. Sess. P.A. 09-5, § 55, does not violate the equal protection clause of the federal constitution.

Because we conclude that neither § 55 nor § 64 of Spec. Sess. P.A. 09-5 discriminates on the basis of alienage, we need not determine whether rational basis review or strict scrutiny applies to classifications based on alienage that purportedly are authorized by the federal government.

## III

### STATE EQUAL PROTECTION CLAIM

As an alternative ground for affirming the judgment of the trial court, the plaintiff claims that §§ 55 and 64 of Spec. Sess. P.A. 09-5 also violate the state constitution. In support of her claim, the plaintiff argues that article first, § 20, of the Connecticut constitution prohibits discrimination on the basis of alienage and that a court reviewing a claim of discrimination on that basis must subject the classification created by the challenged provisions to strict scrutiny. Article first, § 20, of the constitution of Connecticut provides: "No person shall be denied the equal protection of the law nor be subjected to segregation or discrimination in the exercise or enjoyment of his civil or political rights because of religion, race, color, ancestry or national origin."[38] Although this provision does not expressly prohibit discrimination on the basis of alienage, the plaintiff claims that the terms "ancestry" and "national origin," as used in that section, include or are synonymous with alienage. In light of our conclusion in part II of this opinion that the classifications drawn by §§ 55

[38] Although article first, § 20, has been amended by articles five and twenty-one of the amendments to the Connecticut constitution, the additional protected classifications resulting from these amendments, namely, sex and physical and mental disability, have no applicability to the constitutional challenge in the present case.

and 64 of Spec. Sess. P.A. 09-5 are not based on alienage, however, we need not determine whether "ancestry" and "national origin," as used in article first, § 20, prohibit classifications based on alienage.

The judgment is reversed and the case is remanded with direction to render judgment for the defendant.

In this opinion the other justices concurred.